Chief Justice ROBERTS delivered the opinion of the Court.
*2167 The Takings Clause of the Fifth Amendment states that "private property [shall not] be taken for public use, without just compensation." In Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City , 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), we held that a property owner whose property has been taken by a local government has not suffered a violation of his Fifth Amendment rights-and thus cannot bring a federal takings claim in federal court-until a state court has denied his claim for just compensation under state law.
The Williamson County Court anticipated that if the property owner failed to secure just compensation under state law in state court, he would be able to bring a "ripe" federal takings claim in federal court. See id ., at 194, 105 S.Ct. 3108. But as we later held in San Remo Hotel, L. P. v. City and County of San Francisco , 545 U.S. 323, 125 S.Ct. 2491, 162 L.Ed.2d 315 (2005), a state court's resolution of a claim for just compensation under state law generally has preclusive effect in any subsequent federal suit. The takings plaintiff thus finds himself in a Catch-22: He cannot go to federal court without going to state court first; but if he goes to state court and loses, his claim will be barred in federal court. The federal claim dies aborning.
The San Remo preclusion trap should tip us off that the state-litigation requirement rests on a mistaken view of the Fifth Amendment. The Civil Rights Act of 1871, after all, guarantees "a federal forum for claims of unconstitutional treatment at the hands of state officials," and the settled rule is that "exhaustion of state remedies 'is not a prerequisite to an action under [ 42 U.S.C.] § 1983.' " Heck v. Humphrey , 512 U.S. 477, 480, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) (quoting Patsy v. Board of Regents of Fla. , 457 U.S. 496, 501, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982) ). But the guarantee of a federal forum rings hollow for takings plaintiffs, who are forced to litigate their claims in state court.
We now conclude that the state-litigation requirement imposes an unjustifiable burden on takings plaintiffs, conflicts with the rest of our takings jurisprudence, and must be overruled. A property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it. That does *2168 not mean that the government must provide compensation in advance of a taking or risk having its action invalidated: So long as the property owner has some way to obtain compensation after the fact, governments need not fear that courts will enjoin their activities. But it does mean that the property owner has suffered a violation of his Fifth Amendment rights when the government takes his property without just compensation, and therefore may bring his claim in federal court under § 1983 at that time.
I
Petitioner Rose Mary Knick owns 90 acres of land in Scott Township, Pennsylvania, a small community just north of Scranton. Knick lives in a single-family home on the property and uses the rest of the land as a grazing area for horses and other farm animals. The property includes a small graveyard where the ancestors of Knick's neighbors are allegedly buried. Such family cemeteries are fairly common in Pennsylvania, where "backyard burials" have long been permitted.
In December 2012, the Township passed an ordinance requiring that "[a]ll cemeteries ... be kept open and accessible to the general public during daylight hours." The ordinance defined a "cemetery" as "[a] place or area of ground, whether contained on private or public property, which has been set apart for or otherwise utilized as a burial place for deceased human beings." The ordinance also authorized Township "code enforcement" officers to "enter upon any property" to determine the existence and location of a cemetery. App. 21-23.
In 2013, a Township officer found several grave markers on Knick's property and notified her that she was violating the ordinance by failing to open the cemetery to the public during the day. Knick responded by seeking declaratory and injunctive relief in state court on the ground that the ordinance effected a taking of her property. Knick did not seek compensation for the taking by bringing an "inverse condemnation" action under state law. Inverse condemnation is "a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant." United States v. Clarke , 445 U.S. 253, 257, 100 S.Ct. 1127, 63 L.Ed.2d 373 (1980) (quoting D. Hagman, Urban Planning and Land Development Control Law 328 (1971)). Inverse condemnation stands in contrast to direct condemnation, in which the government initiates proceedings to acquire title under its eminent domain authority. Pennsylvania, like every other State besides Ohio, provides a state inverse condemnation action. 26 Pa. Cons. Stat. § 502(c) (2009).[1]
In response to Knick's suit, the Township withdrew the violation notice and agreed to stay enforcement of the ordinance during the state court proceedings. The court, however, declined to rule on Knick's request for declaratory and injunctive relief because, without an ongoing enforcement action, she could not demonstrate the irreparable harm necessary for equitable relief.
Knick then filed an action in Federal District Court under 42 U.S.C. § 1983, alleging that the ordinance violated the Takings Clause of the Fifth Amendment.[2]
*2169 The District Court dismissed Knick's takings claim under Williamson County because she had not pursued an inverse condemnation action in state court. 2016 WL 4701549, *5-*6 (MD Pa., Sept. 8, 2016). On appeal, the Third Circuit noted that the ordinance was "extraordinary and constitutionally suspect," but affirmed the District Court in light of Williamson County . 862 F.3d 310, 314 (2017).
We granted certiorari to reconsider the holding of Williamson County that property owners must seek just compensation under state law in state court before bringing a federal takings claim under § 1983. 583 U.S. ----, 138 S.Ct. 1262, 200 L.Ed.2d 416 (2018).
In Williamson County , a property developer brought a takings claim under § 1983 against a zoning board that had rejected the developer's proposal for a new subdivision. Williamson County held that the developer's Fifth Amendment claim was not "ripe" for two reasons. First, the developer still had an opportunity to seek a variance from the appeals board, so any taking was therefore not yet final. 473 U.S. at 186-194, 105 S.Ct. 3108. Knick does not question the validity of this finality requirement, which is not at issue here.
The second holding of Williamson County is that the developer had no federal takings claim because he had not sought compensation "through the procedures the State ha[d] provided for doing so." Id. , at 194, 105 S.Ct. 3108. That is the holding Knick asks us to overrule. According to the Court, "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the [Takings] Clause until it has used the procedure and been denied just compensation." Id. , at 195, 105 S.Ct. 3108. The Court concluded that the developer's federal takings claim was "premature" because he had not sought compensation through the State's inverse condemnation procedure. Id ., at 197, 105 S.Ct. 3108.
The unanticipated consequences of this ruling were not clear until 20 years later, when this Court decided San Remo . In that case, the takings plaintiffs complied with Williamson County and brought a claim for compensation in state court. 545 U.S. at 331, 125 S.Ct. 2491. The complaint made clear that the plaintiffs sought relief only under the takings clause of the State Constitution, intending to reserve their Fifth Amendment claim for a later federal suit if the state suit proved unsuccessful. Id ., at 331-332, 125 S.Ct. 2491. When that happened, however, and the plaintiffs proceeded to federal court, they found that their federal claim was barred. This Court held that the full faith and credit statute, 28 U.S.C. § 1738, required the federal court to give preclusive effect to the state court's decision, blocking any subsequent consideration of whether the plaintiff had suffered a taking within the meaning of the Fifth Amendment. 545 U.S. at 347, 125 S.Ct. 2491. The adverse state court decision that, according to Williamson County , gave rise to a ripe federal takings claim simultaneously barred that claim, preventing the federal court from ever considering it.
The state-litigation requirement relegates the Takings Clause "to the status of a poor relation" among the provisions of the Bill of Rights. Dolan v. City of Tigard , 512 U.S. 374, 392, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994). Plaintiffs asserting any other constitutional claim are guaranteed *2170 a federal forum under § 1983, but the state-litigation requirement "hand[s] authority over federal takings claims to state courts." San Remo , 545 U.S. at 350, 125 S.Ct. 2491 (Rehnquist, C.J., concurring in judgment). Fidelity to the Takings Clause and our cases construing it requires overruling Williamson County and restoring takings claims to the full-fledged constitutional status the Framers envisioned when they included the Clause among the other protections in the Bill of Rights.
III
A
Contrary to Williamson County , a property owner has a claim for a violation of the Takings Clause as soon as a government takes his property for public use without paying for it. The Clause provides: "[N]or shall private property be taken for public use, without just compensation." It does not say: "Nor shall private property be taken for public use, without an available procedure that will result in compensation." If a local government takes private property without paying for it, that government has violated the Fifth Amendment-just as the Takings Clause says-without regard to subsequent state court proceedings. And the property owner may sue the government at that time in federal court for the "deprivation" of a right "secured by the Constitution." 42 U.S.C. § 1983.
We have long recognized that property owners may bring Fifth Amendment claims against the Federal Government as soon as their property has been taken. The Tucker Act, which provides the standard procedure for bringing such claims, gives the Court of Federal Claims jurisdiction to "render judgment upon any claim against the United States founded either upon the Constitution" or any federal law or contract for damages "in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). We have held that "[i]f there is a taking, the claim is 'founded upon the Constitution' and within the jurisdiction of the Court of Claims to hear and determine." United States v. Causby , 328 U.S. 256, 267, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946). And we have explained that "the act of taking" is the "event which gives rise to the claim for compensation." United States v. Dow , 357 U.S. 17, 22, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958).
The Fifth Amendment right to full compensation arises at the time of the taking, regardless of post-taking remedies that may be available to the property owner. That principle was confirmed in Jacobs v. United States , 290 U.S. 13, 54 S.Ct. 26, 78 L.Ed. 142 (1933), where we held that a property owner found to have a valid takings claim is entitled to compensation as if it had been "paid contemporaneously with the taking"-that is, the compensation must generally consist of the total value of the property when taken, plus interest from that time. Id. , at 17, 54 S.Ct. 26 (quoting Seaboard Air Line R. Co. v. United States , 261 U.S. 299, 306, 43 S.Ct. 354, 67 L.Ed. 664 (1923) ). We rejected the view of the lower court that a property owner is entitled to interest only when the government provides a particular remedy-direct condemnation proceedings-and not when the owner brings a takings suit under the Tucker Act. "The form of the remedy d[oes] not qualify the right. It rest[s] upon the Fifth Amendment." 290 U.S. at 16, 54 S.Ct. 26.
Jacobs made clear that, no matter what sort of procedures the government puts in place to remedy a taking, a property owner has a Fifth Amendment entitlement to compensation as soon as the government takes his property without paying for it. Whether the government does nothing, *2171 forcing the owner to bring a takings suit under the Tucker Act, or whether it provides the owner with a statutory compensation remedy by initiating direct condemnation proceedings, the owner's claim for compensation "rest[s] upon the Fifth Amendment."
Although Jacobs concerned a taking by the Federal Government, the same reasoning applies to takings by the States. The availability of any particular compensation remedy, such as an inverse condemnation claim under state law, cannot infringe or restrict the property owner's federal constitutional claim-just as the existence of a state action for battery does not bar a Fourth Amendment claim of excessive force. The fact that the State has provided a property owner with a procedure that may subsequently result in just compensation cannot deprive the owner of his Fifth Amendment right to compensation under the Constitution, leaving only the state law right. And that is key because it is the existence of the Fifth Amendment right that allows the owner to proceed directly to federal court under § 1983.
Williamson County had a different view of how the Takings Clause works. According to Williamson County , a taking does not give rise to a federal constitutional right to just compensation at that time, but instead gives a right to a state law procedure that will eventually result in just compensation. As the Court put it, "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the [Takings] Clause until it has used the procedure and been denied just compensation." 473 U.S. at 195, 105 S.Ct. 3108. In the absence of a state remedy, the Fifth Amendment right to compensation would attach immediately. But, under Williamson County , the presence of a state remedy qualifies the right, preventing it from vesting until exhaustion of the state procedure. That is what Jacobs confirmed could not be done.
Just two years after Williamson County , in First English Evangelical Lutheran Church of Glendale v. County of Los Angeles , 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987), the Court returned to the understanding that the Fifth Amendment right to compensation automatically arises at the time the government takes property without paying for it. Relying heavily on Jacobs and other Fifth Amendment precedents neglected by Williamson County , First English held that a property owner is entitled to compensation for the temporary loss of his property. We explained that "government action that works a taking of property rights necessarily implicates the 'constitutional obligation to pay just compensation.' " 482 U.S. at 315, 107 S.Ct. 2378. Because of "the self-executing character" of the Takings Clause "with respect to compensation," a property owner has a constitutional claim for just compensation at the time of the taking. Ibid. (quoting 6 P. Nichols, Eminent Domain § 25.41 (3d rev. ed. 1972)). The government's post-taking actions (there, repeal of the challenged ordinance) cannot nullify the property owner's existing Fifth Amendment right: "[W]here the government's activities have already worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation." 482 U.S. at 321, 107 S.Ct. 2378.[3]
*2172 In holding that a property owner acquires an irrevocable right to just compensation immediately upon a taking, First English adopted a position Justice Brennan had taken in an earlier dissent. See id ., at 315, 318, 107 S.Ct. 2378 (quoting and citing San Diego Gas & Elec. Co. v. San Diego , 450 U.S. 621, 654, 657, 101 S.Ct. 1287, 67 L.Ed.2d 551 (1981) (Brennan, J., dissenting)).[4] In that opinion, Justice Brennan explained that "once there is a 'taking,' compensation must be awarded" because "[a]s soon as private property has been taken, whether through formal condemnation proceedings, occupancy, physical invasion, or regulation, the landowner has already suffered a constitutional violation." Id. , at 654, 101 S.Ct. 1287.
First English embraced that view, reaffirming that "in the event of a taking, the compensation remedy is required by the Constitution." 482 U.S. at 316, 107 S.Ct. 2378 ; see ibid ., n. 9 (rejecting the view that "the Constitution does not, of its own force, furnish a basis for a court to award money damages against the government" (quoting Brief for United States as Amicus Curiae 14)). Compensation under the Takings Clause is a remedy for the "constitutional violation" that "the landowner has already suffered" at the time of the uncompensated taking. San Diego Gas & Elec. Co. , 450 U.S. at 654, 101 S.Ct. 1287 (Brennan, J., dissenting); see First English , 482 U.S. at 315, 107 S.Ct. 2378.
A later payment of compensation may remedy the constitutional violation that occurred at the time of the taking, but that does not mean the violation never took place. The violation is the only reason compensation was owed in the first place. A bank robber might give the loot back, but he still robbed the bank. The availability of a subsequent compensation remedy for a taking without compensation no more means there never was a constitutional violation in the first place than the availability of a damages action renders negligent conduct compliant with the duty of care.
In sum, because a taking without compensation violates the self-executing Fifth Amendment at the time of the taking, the property owner can bring a federal suit at that time. Just as someone whose property has been taken by the Federal Government has a claim "founded ... upon the Constitution" that he may bring under the Tucker Act, someone whose property has been taken by a local government has a claim under § 1983 for a "deprivation of [a] right[ ] ... secured by the Constitution" that he may bring upon the taking in federal court. The "general rule" is that plaintiffs may bring constitutional claims under § 1983 "without first bringing *2173 any sort of state lawsuit, even when state court actions addressing the underlying behavior are available." D. Dana & T. Merrill, Property: Takings 262 (2002); see McNeese v. Board of Ed. for Community Unit School Dist. 187 , 373 U.S. 668, 672, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963) (observing that it would defeat the purpose of § 1983 "if we held that assertion of a federal claim in a federal court must await an attempt to vindicate the same claim in a state court"); Monroe v. Pape , 365 U.S. 167, 183, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) ("The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked."). This is as true for takings claims as for any other claim grounded in the Bill of Rights.
B
Williamson County effectively established an exhaustion requirement for § 1983 takings claims when it held that a property owner must pursue state procedures for obtaining compensation before bringing a federal suit. But the Court did not phrase its holding in those terms; if it had, its error would have been clear. Instead, Williamson County broke with the Court's longstanding position that a property owner has a constitutional claim to compensation at the time the government deprives him of his property, and held that there can be no uncompensated taking, and thus no Fifth Amendment claim actionable under § 1983, until the property owner has tried and failed to obtain compensation through the available state procedure. "[U]ntil it has used the procedure and been denied just compensation," the property owner " 'has no claim against the Government' for a taking." 473 U.S. at 194-195, 105 S.Ct. 3108 (quoting Ruckelshaus v. Monsanto Co. , 467 U.S. 986, 1018, n. 21, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) ).
Williamson County drew that understanding of the Clause from Ruckelshaus v. Monsanto Co. , a decision from the prior Term. Monsanto did not involve a takings claim for just compensation. The plaintiff there sought to enjoin a federal statute because it effected a taking, even though the statute set up a special arbitration procedure for obtaining compensation, and the plaintiff could bring a takings claim pursuant to the Tucker Act if arbitration did not yield sufficient compensation. 467 U.S. at 1018, 104 S.Ct. 2862. The Court rejected the plaintiff's claim because "[e]quitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking." Id. , at 1016, 104 S.Ct. 2862 (footnote omitted). That much is consistent with our precedent: Equitable relief was not available because monetary relief was under the Tucker Act.
That was enough to decide the case. But Monsanto went on to say that if the plaintiff obtained compensation in arbitration, then "no taking has occurred and the [plaintiff] has no claim against the Government." Id ., at 1018, n. 21, 104 S.Ct. 2862. Certainly it is correct that a fully compensated plaintiff has no further claim, but that is because the taking has been remedied by compensation, not because there was no taking in the first place. See First English , 482 U.S. at 316, n. 9, 107 S.Ct. 2378. The statute in Monsanto simply required the plaintiff to attempt to vindicate its claim to compensation through arbitration before proceeding under the Tucker Act. The case offers no support to Williamson County in this regard, because Congress-unlike the States-is free to require plaintiffs to exhaust administrative remedies before bringing constitutional claims. See *2174 McCarthy v. Madigan , 503 U.S. 140, 144, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992) ("Where Congress specifically mandates, exhaustion is required.").
Williamson County also relied on Monsanto when it analogized its new state-litigation requirement to federal takings practice, stating that "taking[s] claims against the Federal Government are premature until the property owner has availed itself of the process provided by the Tucker Act." 473 U.S. at 195, 105 S.Ct. 3108. But the Court was simply confused. A claim for just compensation brought under the Tucker Act is not a prerequisite to a Fifth Amendment takings claim-it is a Fifth Amendment takings claim. A party who loses a Tucker Act suit has nowhere else to go to seek compensation for an alleged taking.
Other than Monsanto , the principal case to which Williamson County looked was Parratt v. Taylor , 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). Like Monsanto , Parratt did not involve a takings claim for just compensation. Indeed, it was not a takings case at all. Parratt held that a prisoner deprived of $ 23.50 worth of hobby materials by the rogue act of a state employee could not state a due process claim if the State provided adequate post-deprivation process. 451 U.S. at 543-544, 101 S.Ct. 1908. But the analogy from the due process context to the takings context is strained, as Williamson County itself recognized. See 473 U.S. at 195, n. 14, 105 S.Ct. 3108. It is not even possible for a State to provide pre-deprivation due process for the unauthorized act of a single employee. That is quite different from the taking of property by the government through physical invasion or a regulation that destroys a property's productive use.
The poor reasoning of Williamson County may be partially explained by the circumstances in which the state-litigation issue reached the Court. The Court granted certiorari to decide whether the Fifth Amendment entitles a property owner to just compensation when a regulation temporarily deprives him of the use of his property. ( First English later held that the answer was yes.) As amicus curiae in support of the local government, the United States argued in this Court that the developer could not state a Fifth Amendment claim because it had not pursued an inverse condemnation suit in state court. Neither party had raised that argument before.[5] The Court then adopted the reasoning of the Solicitor General in an alternative holding, even though the case could have been resolved solely on the narrower and settled ground that no taking had occurred because the zoning board had not yet come to a final decision regarding the developer's proposal. In these circumstances, the Court may not have adequately tested the logic of the state-litigation requirement or considered its implications, most notably the preclusion trap later sprung by San Remo . That consequence was totally unanticipated in Williamson County .
The dissent, doing what respondents do not even dare to attempt, defends the original rationale of Williamson County -that there is no Fifth Amendment violation, and *2175 thus no Fifth Amendment claim, until the government denies the property owner compensation in a subsequent proceeding.[6] But although the dissent makes a more thoughtful and considered argument than Williamson County , it cannot reconcile its view with our repeated holdings that a property owner acquires a constitutional right to compensation at the time of the taking. See supra , at 2170 - 2173. The only reason that a taking would automatically entitle a property owner to the remedy of compensation is that, as Justice Brennan explained, with the uncompensated taking "the landowner has already suffered a constitutional violation." San Diego Gas & Elec. Co. , 450 U.S. at 654, 101 S.Ct. 1287 (dissenting opinion). The dissent here provides no more reason to resist that conclusion than did Williamson County .
C
The Court in Williamson County relied on statements in our prior opinions that the Clause "does not provide or require that compensation shall be actually paid in advance of the occupancy of the land to be taken. But the owner is entitled to reasonable, certain and adequate provision for obtaining compensation" after a taking. Cherokee Nation v. Southern Kansas R. Co. , 135 U.S. 641, 659, 10 S.Ct. 965, 34 L.Ed. 295 (1890). Respondents rely on the same cases in contending that uncompensated takings for which compensation is subsequently available do not violate the Fifth Amendment at the time of the taking. But respondents read those statements too broadly. They concerned requests for injunctive relief, and the availability of subsequent compensation meant that such an equitable remedy was not available. See Regional Rail Reorganization Act Cases , 419 U.S. 102, 107, 149, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974) (reversing a decision "enjoin[ing]" the enforcement of a federal statute because "the availability of the Tucker Act guarantees an adequate remedy at law for any taking which might occur"); Hurley v. Kincaid , 285 U.S. 95, 99, 105, 52 S.Ct. 267, 76 L.Ed. 637 (1932) (rejecting a request to "enjoin the carrying out of any work" on a flood control project because the Tucker Act provided the plaintiff with "a plain, adequate, and complete remedy at law"). Simply because the property owner was not entitled to injunctive relief at the time of the taking does not mean there was no violation of the Takings Clause at that time.
The history of takings litigation provides valuable context. At the time of the founding there usually was no compensation remedy available to property owners. On occasion, when a legislature authorized a particular government action that took private property, it might also create a special owner-initiated procedure for obtaining *2176 compensation. But there were no general causes of action through which plaintiffs could obtain compensation for property taken for public use. Brauneis, The First Constitutional Tort: The Remedial Revolution in Nineteenth-Century State Just Compensation Law, 52 Vand. L. Rev. 57, 69-70, and n. 33 (1999).
Until the 1870s, the typical recourse of a property owner who had suffered an uncompensated taking was to bring a common law trespass action against the responsible corporation or government official. The official would then raise the defense that his trespass was lawful because authorized by statute or ordinance, and the plaintiff would respond that the law was unconstitutional because it provided for a taking without just compensation. If the plaintiff prevailed, he nonetheless had no way at common law to obtain money damages for a permanent taking-that is, just compensation for the total value of his property. He could obtain only retrospective damages, as well as an injunction ejecting the government from his property going forward. See id ., at 67-69, 97-99.
As Chancellor Kent explained when granting a property owner equitable relief, the Takings Clause and its analogs in state constitutions required that "a fair compensation must, in all cases, be previously made to the individuals affected." Gardner v. Newburgh , 2 Johns.Ch. 162, 166 (N. Y. 1816) (emphasis added). If a government took property without payment, a court would set aside the taking because it violated the Constitution and order the property restored to its owner. The Framers meant to prohibit the Federal Government from taking property without paying for it. Allowing the government to keep the property pending subsequent compensation to the owner, in proceedings that hardly existed in 1787, was not what they envisioned.
Antebellum courts, which had no means of compensating a property owner for his loss, had no way to redress the violation of an owner's Fifth Amendment rights other than ordering the government to give him back his property. See Callender v. Marsh , 18 Mass. 418, 430-431 (1823) ("[I]f by virtue of any legislative act the land of any citizen should be occupied by the public ..., without any means provided to indemnify the owner of the property, ... because such a statute would be directly contrary to the [Massachusetts takings clause]; and as no action can be maintained against the public for damages, the only way to secure the party in his constitutional rights would be to declare void the public appropriation."). But in the 1870s, as state courts began to recognize implied rights of action for damages under the state equivalents of the Takings Clause, they declined to grant injunctions because property owners had an adequate remedy at law. See, e.g. , Stetson v. Chicago & Evanston R. Co. , 75 Ill. 74, 78 (1874) ("What injury, if any, [the property owner] has sustained, may be compensated by damages recoverable by an action at law."); see also Brauneis, supra , at 97-99, 110-112. On the federal level, Congress enabled property owners to obtain compensation for takings in federal court when it passed the Tucker Act in 1887, and we subsequently joined the state courts in holding that the compensation remedy is required by the Takings Clause itself. See First English , 482 U.S. at 316, 107 S.Ct. 2378 (collecting cases).
Today, because the federal and nearly all state governments provide just compensation remedies to property owners who have suffered a taking, equitable relief is generally unavailable. As long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking.
*2177 But that is because, as the Court explained in First English , such a procedure is a remedy for a taking that violated the Constitution, not because the availability of the procedure somehow prevented the violation from occurring in the first place. See supra , at 2171 - 2173.[7]
The dissent contends that our characterization of Cherokee Nation effectively overrules "a hundred-plus years of legal rulings." Post , at 2183 (opinion of KAGAN, J.). But under today's decision every one of the cases cited by the dissent would come out the same way-the plaintiffs would not be entitled to the relief they requested because they could instead pursue a suit for compensation. The premise of such a suit for compensation is that the property owner has already suffered a violation of the Fifth Amendment that may be remedied by money damages.[8]
* * *
We conclude that a government violates the Takings Clause when it takes property without compensation, and that a property owner may bring a Fifth Amendment claim under § 1983 at that time. That does not as a practical matter mean that government action or regulation may not proceed in the absence of contemporaneous compensation. Given the availability of post-taking compensation, barring the government from acting will ordinarily not be appropriate. But because the violation is complete at the time of the taking, pursuit of a remedy in federal court need not await any subsequent state action. Takings claims against local governments should be handled the same as other claims under the Bill of Rights. Williamson County erred in holding otherwise.
IV
The next question is whether we should overrule Williamson County , or whether stare decisis counsels in favor of adhering to the decision, despite its error. The doctrine of stare decisis reflects a judgment "that 'in most matters it is more important that the applicable rule of law be settled than that it be settled right.' " Agostini v. Felton , 521 U.S. 203, 235, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (quoting Burnet v. Coronado Oil & Gas Co. , 285 U.S. 393, 406, 52 S.Ct. 443, 76 L.Ed. 815 (1932) (Brandeis, J., dissenting)). The doctrine "is at its weakest when we interpret the Constitution," as we did in Williamson County , because only this Court or a constitutional amendment can alter our holdings.
*2178 Agostini , 521 U.S. at 235, 117 S.Ct. 1997.
We have identified several factors to consider in deciding whether to overrule a past decision, including "the quality of [its] reasoning, the workability of the rule it established, its consistency with other related decisions, ... and reliance on the decision." Janus v. State , County , and Municipal Employees , 585 U.S. ----, ---- - ----, 138 S.Ct. 2448, 2478, 201 L.Ed.2d 924 (2018). All of these factors counsel in favor of overruling Williamson County .
Williamson County was not just wrong. Its reasoning was exceptionally ill founded and conflicted with much of our takings jurisprudence. See supra , at 2173 - 2174. Its key conclusion, which it drew from unnecessary language in Monsanto -that a property owner does not have a ripe federal takings claim until he has unsuccessfully pursued an initial state law claim for just compensation-ignored Jacobs and many subsequent decisions holding that a property owner acquires a Fifth Amendment right to compensation at the time of a taking. This contradiction was on stark display just two years later in First English .
The decision has come in for repeated criticism over the years from Justices of this Court and many respected commentators. See San Remo , 545 U.S. at 348, 125 S.Ct. 2491 (Rehnquist, C.J., joined by O'Connor, Kennedy, and THOMAS, JJ., concurring in judgment); Arrigoni Enterprises , LLC v. Durham , 578 U.S. ----, 136 S.Ct. 1409, 194 L.Ed.2d 821 (2016) (THOMAS, J., joined by Kennedy, J., dissenting from denial of certiorari); Merrill, Anticipatory Remedies for Takings, 128 Harv. L. Rev. 1630, 1647-1649 (2015) ; McConnell, Horne and the Normalization of Takings Litigation: A Response to Professor Echeverria, 43 Env. L. Rep. 10749, 10751 (2013); Friedman, Under the Law of Federal Jurisdiction: Allocating Cases Between Federal and State Courts, 104 Colum. L. Rev. 1211, 1264 (2004) ; Monaghan, State Law Wrongs, State Law Remedies, and the Fourteenth Amendment, 86 Colum. L. Rev. 979, 989 (1986). Even the academic defenders of the state-litigation requirement base it on federalism concerns (although they do not reconcile those concerns with the settled construction of § 1983 ) rather than the reasoning of the opinion itself. See Echeverria, Horne v. Department of Agriculture : An Invitation To Reexamine "Ripeness" Doctrine in Takings Litigation, 43 Env. L. Rep. 10735, 10744 (2013); Sterk, The Demise of Federal Takings Litigation, 48 Wm. & Mary L. Rev. 251, 288 (2006).
Because of its shaky foundations, the state-litigation requirement has been a rule in search of a justification for over 30 years. We eventually abandoned the view that the requirement is an element of a takings claim and recast it as a "prudential" ripeness rule. See Horne v. Department of Agriculture , 569 U.S. 513, 525-526, 133 S.Ct. 2053, 186 L.Ed.2d 69 (2013) ; Suitum v. Tahoe Regional Planning Agency , 520 U.S. 725, 733-734, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997). No party defends that approach here. See Brief for Respondents 37; Brief for United States as Amicus Curiae 19-20. Respondents have taken a new tack, adopting a § 1983-specific theory at which Williamson County did not even hint. See n. 6, supra . The fact that the justification for the state-litigation requirement continues to evolve is another factor undermining the force of stare decisis . See Janus , 585 U.S., at ----, 138 S.Ct., at 2472
The state-litigation requirement has also proved to be unworkable in practice. Williamson County envisioned that takings plaintiffs would ripen their federal claims *2179 in state court and then, if necessary, bring a federal suit under § 1983. But, as we held in San Remo , the state court's resolution of the plaintiff's inverse condemnation claim has preclusive effect in any subsequent federal suit. The upshot is that many takings plaintiffs never have the opportunity to litigate in a federal forum that § 1983 by its terms seems to provide. That significant consequence was not considered by the Court in Williamson County .
The dissent argues that our constitutional holding in Williamson County should enjoy the "enhanced" form of stare decisis we usually reserve for statutory decisions, because Congress could have eliminated the San Remo preclusion trap by amending the full faith and credit statute. Post , at 2189 (quoting Kimble v. Marvel Entertainment , LLC , 578 U.S. ----, ----, 135 S.Ct. 2401, 2409-2410, 192 L.Ed.2d 463 ). But takings plaintiffs, unlike plaintiffs bringing any other constitutional claim, would still have been forced to pursue relief under state law before they could bring suit in federal court. Congress could not have lifted that unjustified exhaustion requirement because, under Williamson County , a property owner had no federal claim until a state court denied him compensation.
Finally, there are no reliance interests on the state-litigation requirement. We have recognized that the force of stare decisis is "reduced" when rules that do not "serve as a guide to lawful behavior" are at issue. United States v. Gaudin , 515 U.S. 506, 521, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995) ; see Alleyne v. United States , 570 U.S. 99, 119, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013) (SOTOMAYOR, J., concurring). Our holding that uncompensated takings violate the Fifth Amendment will not expose governments to new liability; it will simply allow into federal court takings claims that otherwise would have been brought as inverse condemnation suits in state court.
Governments need not fear that our holding will lead federal courts to invalidate their regulations as unconstitutional. As long as just compensation remedies are available-as they have been for nearly 150 years-injunctive relief will be foreclosed. For the same reason, the Federal Government need not worry that courts will set aside agency actions as unconstitutional under the Administrative Procedure Act. 5 U.S.C. § 706(2)(B). Federal courts will not invalidate an otherwise lawful uncompensated taking when the property owner can receive complete relief through a Fifth Amendment claim brought under the Tucker Act.
In light of all the foregoing, the dissent cannot, with respect, fairly maintain its extreme assertions regarding our application of the principle of stare decisis .
* * *
The state-litigation requirement of Williamson County is overruled. A property owner may bring a takings claim under § 1983 upon the taking of his property without just compensation by a local government. The judgment of the United States Court of Appeals for the Third Circuit is vacated, and the case is remanded for further proceedings consistent with this opinion.
It is so ordered.

A property owner in Ohio who has suffered a taking without compensation must seek a writ of mandamus to compel the government to initiate condemnation proceedings. See, e.g. , State ex rel. Doner v. Zody , 130 OhioSt.3d 446, 2011-Ohio-6117, 958 N.E.2d 1235.

Section 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law ...."

First English distinguished Williamson County in a footnote, explaining that the case addressed only "whether the constitutional claim was ripe for review" before the State denied compensation. 482 U.S. at 320, n. 10, 107 S.Ct. 2378. But Williamson County was based on the premise that there was no Fifth Amendment claim at all until the State denies compensation. Having rejected that premise, First English eliminated the rationale for the state-litigation requirement. The author of First English later recognized that it was "not clear ... that Williamson County was correct in demanding that ... the claimant must seek compensation in state court before bringing a federal takings claim in federal court." San Remo Hotel, L. P. v. City and County of San Francisco , 545 U.S. 323, 349, 125 S.Ct. 2491, 162 L.Ed.2d 315 (2005) (Rehnquist, C.J., concurring in judgment).

Justice Brennan was joined by Justices Stewart, Marshall, and Powell. The majority did not disagree with Justice Brennan's analysis of the merits, but concluded that the Court lacked jurisdiction to address the question presented. Justice Rehnquist, concurring on the jurisdictional issue, noted that if he were satisfied that jurisdiction was proper, he "would have little difficulty in agreeing with much of what is said in the dissenting opinion." 450 U.S. at 633-634, 101 S.Ct. 1287. The Court reached the merits of the question presented in San Diego in First English , adopting Justice Brennan's view in an opinion by Chief Justice Rehnquist.

The Solicitor General continues this tradition here, arguing for the first time as amicus curiae that state inverse condemnation claims "aris[e] under" federal law and can be brought in federal court under 28 U.S.C. § 1331 through the Grable doctrine. Brief for United States as Amicus Curiae 22-24; see Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg. , 545 U.S. 308, 125 S.Ct. 2363, 162 L.Ed.2d 257 (2005). Because we agree with the Solicitor General's principal contention that federal takings claims can be brought immediately under § 1983, we have no occasion to consider his novel § 1331 argument.

The dissent thinks that respondents still press this theory. Post , at 2183 n. 3. But respondents instead describe Williamson County as resting on an understanding not of the elements of a federal takings claim but of the scope of 42 U.S.C. § 1983. They even go so far as to rewrite petitioner's question presented in such terms. Brief for Respondents i. For respondents, it does not matter whether a property owner has a Fifth Amendment claim at the time of a taking. What matters is that, in respondents' view, no constitutional violation occurs for purposes of § 1983 until the government has subsequently denied compensation. That characterization has no basis in the Williamson County opinion, which did not even quote § 1983 and stated that the Court's reasoning applied with equal force to takings by the Federal Government, not covered by § 1983. 473 U.S. at 195, 105 S.Ct. 3108. Respondents' attempt to recast the state-litigation requirement as a § 1983-specific rule fails for the same reason as the logic of Williamson County -a property owner has a Fifth Amendment claim for a violation of the Takings Clause as soon as the government takes his property without paying for it.

Among the cases invoking the Cherokee Nation language that the parties have raised, only one, Yearsley v. W. A. Ross Constr. Co. , 309 U.S. 18, 60 S.Ct. 413, 84 L.Ed. 554 (1940), rejected a demand for compensation. Yearsley concerned a state tort suit alleging a taking by a contractor building dikes for the Federal Government. In ruling for the contractors, we suggested that the taking did not violate the Fifth Amendment because the property owner had the opportunity to pursue a claim for just compensation under the Tucker Act. As explained, however, a claim for compensation brought under the Tucker Act is a claim for a violation of the Fifth Amendment; it does not prevent a violation from occurring. Regardless, Yearsley was right to hold that the contractors were immune from suit. Because the Tucker Act provides a complete remedy for any taking by the Federal Government, it "excludes liability of the Government's representatives lawfully acting on its behalf in relation to the taking," barring the plaintiffs from seeking any relief from the contractors themselves. Id. , at 22, 60 S.Ct. 413.

The dissent also asserts that today's ruling "betrays judicial federalism." Post , at 2189. But since the Civil Rights Act of 1871, part of "judicial federalism" has been the availability of a federal cause of action when a local government violates the Constitution. 42 U.S.C. § 1983. Invoking that federal protection in the face of state action violating the Fifth Amendment cannot properly be regarded as a betrayal of federalism.