In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 20-1934

BLAKE CONYERS, LAMAR EWING, and KEVIN FLINT, individually and for a class,

*Plaintiffs-Appellants*,

*v.*

CITY OF CHICAGO,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 C 06144 — **John J. Tharp, Jr.**, *Judge*.

———————————

ARGUED FEBRUARY 25, 2021 — DECIDED AUGUST 18, 2021

———————————

Before EASTERBROOK, WOOD, and KIRSCH, *Circuit Judges*.

WOOD, *Circuit Judge*. The City of Chicago requires its police officers to seize, inventory, and store any property belonging to an arrested person, if that property is not permitted in the Cook County Jail. After 30 days, the City deems abandoned any property unclaimed by the owner or her authorized representative, and it sells or destroys the presumptively abandoned items. CHI., ILL., MUNICIPAL CODE § 2-84-160 *et seq.*

(2007). Blake Conyers, Lamar Ewing, and Kevin Flint seek to represent hundreds of people whose property has been destroyed under this regime. Invoking 42 U.S.C. § 1983 and several constitutional provisions, they challenge the City's policy as unconstitutional.

It is important to note at the outset that the City's right to seize and inventory the property upon arrest is not at issue. It is well settled that it may do so. See *Illinois v. Lafayette*, 462 U.S. 640, 646 (1983). Likewise, plaintiffs do not contend that municipalities are not permitted to manage seized property. Their focus is instead on the policy the City has chosen for property owned by arrestees held at the Jail for more than the permitted 30-day period. As applied to that property, they contend, the City's destroy-or-sell policy violates the Fourth, Fifth, and Fourteenth Amendments, as well as Illinois law. While we can understand their frustration, however, we find no error in the district court's decision that they have failed to state any claim on which relief can be granted. We therefore affirm the judgment of the district court.

## I

Since 2007, the City of Chicago has had an explicit policy pursuant to which it keeps possession of the property of each arrestee transferred to the custody of the Sheriff of Cook County for detention at the Cook County Jail. There are a few exceptions to the confiscation policy. The Sheriff allows arrestees to keep certain items, including outer garments, U.S. currency of $500 or less, one plain metal ring without stones, government-issued identification cards, prescription glasses and medications, shoelaces, belts, keys, court documents, police receipts, credit cards, and debit cards. See Chicago Police Department (CPD) Notice 07-40, as amended by CPD Special

Order S06-01-12. (The City has amended this list since the in-
itiation of this lawsuit, but these changes do not affect our
analysis.)

At the time of Blake Conyers's arrest in February 2012,
CPD seized from his person an earring, a bracelet, and two
cell phones. Lamar Ewing was required to turn over his wal-
let, a debit card, a library card, and two cell phones in connec-
tion with his December 2012 arrest, and Kevin Flint relin-
quished a cell phone and a ring with a small stone at his Jan-
uary 2013 arrest. All three men were then transferred to the
Cook County Jail. Pursuant to CPD Notice 07-40, the City kept
possession of each one's property under a unique tracking
number, sending it to its Evidence and Recovered Property
Section ("Recovered Property," or "ERPS") for storage.

Between December 1, 2011, and December 31, 2013, the
City's policy was to give every arrestee an inventory receipt
that identified the seized property. The receipt included a
short note that explained the governing procedures. It ad-
vised the holder to contact Recovered Property by phone; it
informed the arrestee that he or she should have received an-
other form entitled "Notice to Property Owner or Claimant";
and it told him that he could either visit the CPD's website for
a complete copy of the Notice or go back to the CPD facility
at which his property was inventoried and there obtain a hard
copy. The hard-copy Notice stated in part:

> You may get inventoried property back by following
> the procedures detailed below. Information on how to
> get back inventoried property is also available at
> www.ChicagoPolice.org. If you have any questions,
> please contact the CPD Evidence and Recovered Prop-
> erty Section ("ERPS") at (312) 746-6777. ERPS is located

at 1011 S. Homan Avenue, Chicago, Illinois 60624 and is open Monday through Friday (8:00 a.m. to 3:00 p.m., closed holidays).

**Property Available for Return to Owner:**

If your receipt is marked "Property Available for Return to Owner" you may get your property back by providing the receipt and a photo ID at ERPS. If you do not contact the CPD to get your property back within 30 days of the date on this receipt, it will be considered abandoned under Chicago Municipal Code Section 2-84-160, and the forfeiture process will begin under Illinois Law, 765 ILCS 1030/1, et seq.

If you are in jail or incarcerated, and your receipt is marked "Property Available for Return to Owner," you may get money returned to you by sending copies of your receipt, your photo ID and the name of the facility where you are jailed or incarcerated to: Chicago Police Department Evidence and Recovered Property Section; 1011 S. Homan Avenue, Chicago, Illinois, 60624. If the property is money, a check will be sent to you at the facility where you are jailed or incarcerated.

The CPD website, which the hard-copy Notice and receipt directed arrestees to visit, provided additional information about non-monetary property and third-party authorized representatives:

If you are in jail or incarcerated, and your receipt is marked "Property Available for Return to Owner," you may get personal property returned to you by designating a representative in writing, pursuant to the procedures of the facility where you are jailed or

> incarcerated. You must have your designated repre-
> sentative bring your receipt, the written authorization
> designating your representative and authorizing your
> representative to pick up your property, and a photo
> ID to: Chicago Police Department[,] Evidence and Re-
> covered Property Section; 1011 S. Homan Avenue, Chi-
> cago, Illinois, 60624 during business hours, Monday
> through Friday (8:00 a.m. to 3:00 p.m., closed holidays).

None of the plaintiffs contacted the CPD to reclaim his prop-
erty in any of the ways designated in these notices within the
required 30-day period, and so the City destroyed it.

Conyers initiated this lawsuit on August 3, 2012. The third
amended complaint, filed on September 13, 2013, is the first
one that the district court considered. In it, plaintiffs alleged
that the notice the City furnished was not adequate to alert
them to the fact that CPD would destroy their personal prop-
erty if they did not claim it within 30 days after they were
transferred from CPD's custody to that of the Sheriff. The in-
adequate notice, they asserted, violated their rights under the
Fourth and Fourteenth Amendments to the Constitution, as
well as the Takings Clause of the Fifth Amendment. See U.S.
CONST. amends. IV, V, XIV.

The district court found plaintiffs' Fourth Amendment
claim foreclosed by our decision in *Lee v. City of Chicago*, 330
F.3d 456 (7th Cir. 2003), and dismissed it with prejudice. The
takings theory met the same fate: the court found that plain-
tiffs' effort to assert a facial violation of the Takings Clause
failed for lack of an allegation that the City took their property
without providing just compensation. To the extent plaintiffs
were complaining about lack of adequate notice, the court
ruled, the correct theory was due process. Plaintiffs fared no

better with an as-applied approach to takings, because (contrary to the requirements of the then-applicable law) they had not exhausted state-court remedies. See *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 195 (1985). (The Court overruled *Williamson County* in *Knick v. Township of Scott, Pa.*, 139 S. Ct. 2162 (2019), and so the district court's exhaustion rationale is no longer correct. We have more to say about this below.) Finally, the district court found that plaintiffs lacked standing to bring a Fourteenth Amendment due-process claim because they had not alleged that they relied on the notice to their detriment.

In response to these adverse rulings, plaintiffs filed a fourth amended complaint on April 21, 2015. The court dismissed the Fifth Amendment claims without prejudice, again on exhaustion grounds, but it allowed an updated due-process count to proceed. Plaintiffs' primary point was that the City's policy of destruction or sale was not publicly available, and so it did not alert anyone to the imminent loss of his property. Plaintiffs also criticized the hard-copy Notice for failing to describe the procedures through which incarcerated persons could secure the return of non-monetary property or the details about how a third-party representative could retrieve the property. Although that information was found on CPD's website, and the hard-copy Notice directed arrestees to visit that site, plaintiffs asserted that jail detainees did not have ready access to the Internet and thus as a practical matter could not benefit from information found there. In their view, nothing but individualized notice, furnished before any step was taken to sell or destroy the property, would be sufficient to satisfy due-process requirements. See *Gates v. City of Chicago*, 623 F.3d 389, 412 (7th Cir. 2010) (requiring individualized notice in the absence of publicly available policies). The

court found that the question whether Cook County detainees could obtain access to the Internet was a factual dispute that required further development in the record.

Ahead of discovery geared toward that dispute, the district court certified the following class:

> All persons who, following an arrest, had property inventoried as "available for return to Owner" by the Chicago Police Department from December 1, 2011 to December 31, 2013, who were then held in custody for more than 30 days and whose property was destroyed or sold by the Chicago Police Department.

Both parties filed motions for summary judgment. The court boiled the factual-dispute analysis down to three questions, affirmative answers to which would establish that the City had provided plaintiffs with adequate notice of its procedures:

> (1) does the content of the website satisfy the City's due process obligations? (2) did Cook County Jail inmates have access to the internet during the class period? and (3) if Cook County Jail inmates did have access, has the City sufficiently established that the webpage was active and online during the class period?

With respect to question 1, everyone agreed that the content of the notice on the website was sufficient. There was less harmony about question 2. The City argued that law librarians and social workers at the Jail, called Correctional Rehabilitation Workers (CRWs), routinely retrieved information from the Internet on behalf of detainees. Detainees could also submit requests to the CRWs to contact the Recovered Property Section on their behalf. (Perhaps for obvious reasons, CPD

units do not accept collect calls.) Plaintiffs challenged the CRW assistance system as unavailable in practice, but the district court found that they failed to provide any convincing evidence in support of their argument. In the interest of completeness, the court then moved to the third question: Can the City establish that the webpage was active during the class period?

The City presented a June 13, 2013, screenshot of the CPD website that then-Commander of the Recovered Property Section, Michael J. Mealer, had used during a deposition for another unrelated but factually similar matter. The screenshot by itself does not show whether the website was active during the class period. But there was more: Mealer provided a declaration confirming that the screenshot accurately captured the CPD website for the entirety of the class period. The court found the City's evidence sufficient to answer the third and final question affirmatively, and so it granted the City's motion for summary judgment.

We alluded briefly to *Knick* earlier. As we noted, during the time this lawsuit was pending in the district court, a significant change in takings law took place. In *Knick*, the Supreme Court announced that "a property owner has a claim for a violation of the Takings Clause as soon as a government takes his property for public use without paying for it." 139 S. Ct. at 2170. Thus, contrary to *Williamson County*, plaintiffs do not have to exhaust state-court remedies prior to bringing a takings claim. In light of *Knick*, Plaintiffs asked the court to reconsider its dismissal of their Takings Clause claim. The court declined, finding that plaintiffs had not presented enough evidence to support a finding that the destruction of

their property was done for "public use." Plaintiffs now appeal from all these rulings.

## II

### A

We first consider the question whether plaintiffs' property was seized by the City in violation of their Fourth Amendment rights. As the district court correctly recognized, the leading case on this point is our decision in *Lee*. That case involved the efforts of plaintiff Lee to retrieve his car from the City after the police no longer needed it for evidentiary purposes. *Lee*, 330 F.3d at 458–59. While the City possessed the car, it had spray-painted prominent inventory numbers in several places, thus ruining the paint job. *Id.* at 459. Invoking the Fourth Amendment, Lee complained about both the City's insistence that he pay towage and storage fees before recovering his car and about the damage from the spray-painting. *Id.*

We began our Fourth Amendment analysis by noting that Lee did not challenge the initial impoundment of the car for evidentiary purposes. *Id.* at 460. Nor did Lee make any claim related to the length of time the City took to complete its search of the car. *Id.* Instead, he contended that its refusal to return the car until Lee paid the storage and towing fees amounted to an additional seizure. *Id.* He also argued that the City's retention of the car after its law-enforcement interest expired was an impermissible seizure. *Id.* We rejected both points. "At bottom," we concluded, "Lee's complaint against the charging of towing and storage fees concerns the fairness and integrity of the criminal-justice process, and does not seek to constrain unlawful *intrusions* into the constitutionally

protected areas of the Fourth Amendment." *Id.* at 465 (emphasis in original).

If *Lee* stood alone, it might indeed resolve this part of the plaintiffs' case. But it does not. Plaintiffs contend that the Supreme Court's later decision in *Manuel v. City of Joliet*, 137 S. Ct. 911 (2017), shows that *Lee* wrongly rejected the idea that the Fourth Amendment applies to a continuing seizure. See also *Brewster v. Beck*, 859 F.3d 1194, 1197 (9th Cir. 2017) (finding that a "seizure is justified under the Fourth Amendment only to the extent that the government's justification holds force. Thereafter, the government must cease the seizure or secure a new justification."). But for at least two reasons, *Manuel* does not help them. First, *Manuel* dealt with pretrial confinement, not the retention of property. More importantly, even if we were to equate persons and property for these purposes, it would not help our plaintiffs. *Manuel* was about a defendant's ability to show that a finding of probable cause—necessary to support the detention—was based upon fabricated evidence. 137 S. Ct. at 914. In other words, were the seizure and detention flawed from the outset? No such question arose in *Lee*, and no such question exists in our case. All we are concerned with is the distinct question whether the City had a duty to release the property sooner, or on more favorable terms. As *Lee* recognized, that issue falls more naturally under the Due Process Clause of the Fourteenth Amendment, or perhaps the Takings Clause of the Fifth Amendment. The district court thus correctly rejected the plaintiffs' Fourth Amendment theory.

## B

At the time the district court had this case, the Supreme Court had a firm rule that no Takings Clause case could go

forward until all state remedies—including state-court op-
tions—had been exhausted. See *Williamson County*, 473 U.S. at
195. But the Court announced a new rule in *Knick*, which held
that "a property owner has a claim for a violation of the Tak-
ings Clause as soon as a government takes his property for
public use without paying for it," and that the owner had no
obligation to exhaust state remedies before suing. 139 S. Ct. at
2170.

Although the district court's reliance on the now-repudi-
ated exhaustion rule meant that it did not reach the merits of
the plaintiffs' takings claim, our review of this legal issue is *de
novo*, and so nothing prevents us from examining on our own
whether summary judgment was nevertheless proper on this
aspect of the case. A person who asserts a Takings Clause
claim must show several things: (1) that the governmental en-
tity "took" his property, either through a physical taking, see
*Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021), or
through unduly onerous regulations, *id*. at 2071–72; (2) that
the taking was for a public use, see *Kelo v. City of New London*,
545 U.S. 469, 477 (2005); and (3) that, no matter what type of
property (real or personal) was taken, the government has not
paid just compensation, see *Horne v. Dep't of Agriculture*, 576
U.S. 350, 358 (2015).

Implicit in this scheme is the predicate requirement that
the private property must belong to the plaintiff. This is not
one of those situations in which a plaintiff would be permit-
ted to assert third-party rights. See *Kowalski v. Tesmer*, 543 U.S.
125, 129–30 (2004) (third-party rights may be raised only if the
party raising the claim has a close relationship with the per-
son who possesses the right, and only if there is a hindrance
preventing the possessor from protecting his own interests).

And the case of abandoned property is, if anything, even more straightforward. As we wrote in *Cerajeski v. Zoeller*, 735 F.3d 577 (7th Cir. 2013), "[*o*]*f course* the state can take abandoned property without compensation—there is no owner to compensate." *Id.* at 581 (emphasis in original).

In our case, we can assume that the City "took" the personal-property items from the plaintiffs, that there was a valid public use stemming from the City's asserted (and unrefuted) constraints on storage space for seized property, and that the plaintiffs were not compensated for the items in question. The key question is whether the City was entitled to treat this property as abandoned—that is, intentionally relinquished—when the plaintiffs failed to follow the reclamation procedures the City offered. Nothing compels the City to hold property forever. At the other end of the spectrum, we can assume that a statutory declaration of abandonment after only one day would be untenable. But where, between a day and forever, does the Constitution draw the line?

The City argues that because its original seizure of the property was done pursuant to its police powers, not its power of eminent domain, there are no limits on its authority to dispose of the property. It relies on *Bennis v. Michigan*, 516 U.S. 442 (1996), but there are significant differences between *Bennis* and the present case. In *Bennis*, a Michigan court ordered the forfeiture on public-nuisance grounds of a car that was jointly owned by Husband and Wife, when Husband was caught in the car engaged in sexual activity with a prostitute. *Id.* at 443. Wife argued that the forfeiture, as applied to her, was an unconstitutional taking, but the Court said no. *Id.* at 452. Critically, the Michigan court's order transferred 100% of the ownership of the car to the state, and it did so

permanently, for a punitive reason. See *id*. at 443, 451. In that situation, the Supreme Court said that "[t]he government may not be required to compensate an owner for property which it has already lawfully acquired under the exercise of governmental authority other than the power of eminent domain." *Id.* at 452.

In the case before us, however, the City did not seize the plaintiffs' property with an intent to keep it permanently; its motive for the original seizure related to safety at the Jail, not punishment of the property owner; and the 30-day limit reflected the practical constraints on storage capacity. Both the written notice and the website instructions disclaim any intent either to punish the owner or to retain the property. To the contrary, the City offered several ways for the detainee to reclaim his property, and it facilitated that process by giving Jail inmates access to Correctional Rehabilitation Workers and offering a way for a chosen representative to recover the property. Only if all of that failed did the City deem the property abandoned. Practical, not punitive, considerations lie behind the destroy-or-sell regime that the City follows. *Bennis*, in short, is a poor fit for the City's system of controlling property in the hands of detainees.

Nonetheless, several considerations persuade us that there is nothing unconstitutional about the City's decision to deem property abandoned after 30 days have elapsed. First, the detainee knows exactly what has been taken from him and when that confiscation occurred. Second, the detainee is told both how (either personally or through a representative) to get his property back and how quickly he must do so. Finally, the hard-copy Notice plainly states that "[i]f you do not contact the CPD to get your property back *within 30 days of the*

*date on this receipt*, it will be considered abandoned under Chicago Municipal Code Section 2-84-160, and the forfeiture process will begin … ." (Emphasis added.) This all looks plain to us—plain enough to entitle the City to treat as abandoned any property that remains unclaimed after 30 days have gone by. And, as *Cerajeski* holds, genuinely abandoned property does not belong to anyone, 735 F.3d at 581, and thus the City may dispose of it as it sees fit.

C

We acknowledge that our takings analysis is, to a degree, intertwined with the adequacy of the notice that members of the plaintiff class received. But notice is quintessentially an element of due process, not the power of government to take property. Due process demands both adequate notice and an opportunity to be heard before the state may take property. See *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950); *Black Earth Meat Market, LLC v. Village of Black Earth*, 834 F.3d 841, 850 (7th Cir. 2016). The district court recognized that the question whether the notice provided by the City met constitutional standards was a serious one, and so it allowed discovery to proceed on that issue. At the summary-judgment stage, the court assumed that the initial notice might not have been enough by itself to satisfy due process. On the other hand, it thought that the information available on the CPD website was adequate, *if* it was accessible to the Jail inmates. As we noted earlier, the court identified three subsidiary questions: (1) the adequacy of the content found on the website; (2) the adequacy of inmate access to the website; and (3) proof that the website was active and online during the class period. It answered all three in the affirmative, and on that basis concluded that the City's notice was

satisfactory under the standards enunciated in *Gates v. City of Chicago*, 623 F.3d 389 (7th Cir. 2010).

We agree with the district court that the answer to the first question favors the City. Indeed, as we just noted, plaintiffs do not argue that the *content* found on the website is too terse or omits critical points. It explains just what a detainee must do, either in person or through a delegate, to ensure the recovery of property within the 30 days the City provides.

As for the third question—whether the webpage was active during the class period—the City presented evidence showing that it was, and plaintiffs pointed to nothing but speculation to undermine that showing. The City submitted two pieces of evidence to support its position: a screenshot of a document showing the webpage, and the testimony of the then-Commander of Evidence and Recovered Property, Michael J. Mealer. Mealer confirmed that the document shown in the screenshot was an accurate representation of the CPD website for the entirety of the class period.

The plaintiffs contend, in response, that Mealer could not authenticate the screenshot, because pursuant to our holding in *Specht v. Google*, only someone with personal knowledge of the reliability of the archive service from which the screenshots were retrieved can do so. 747 F.3d 929, 933 (7th Cir. 2014). The City did not rely on an archive service, however; it relied instead on the head of the section, who had personal knowledge of the information on the website. Mealer also testified that before authenticating the screenshot, he reviewed it and found it to be the same as the one about which he testified in a different case, *Elizarri v. Sheriff of Cook County*, No. 07 C 2427, 2011 WL 247288 (N.D. Ill. Jan. 24, 2011). Nothing in Federal Rules of Evidence 1002 (requirement of an original

"writing, recording, or photograph") or 1006 ("summaries to prove content") undermines this conclusion, as neither of those rules addresses the issue of screenshot authentication. The City thus established the third point the district court identified.

That leaves the second and most difficult: did the undisputed facts show that, as a practical matter, the Jail inmates had access to the CPD's website, and hence to the vital information it contained about the way to recover seized property?

The Deputy Director of Inmate Services, John Mueller, offered the following testimony on that point during his deposition:

Q:  If an inmate wants or needs access to the internet for some reason, are there procedures in place to handle those requests?

A:  Yes.

Q:  Can you describe those for us?

A:  It's an inmate request procedure. It's a document that the – that's available on each of the living units. The inmate fills it out. It's submitted to the CRWs [Correctional Rehabilitation Workers] on a daily basis, and when the CRW goes to that living unit to respond to the request, they provide the response to their request.

Q:  Let me ask you a couple questions about what you just said. The request form that the inmates use is there available in the living unit; is that right?

A:  They are. We also accept their request on blank paper as well. It's not limited to a form.

Q: Are they submitted to some type of drop box or other area where the CRWs then check for them?

A: Sure. What happens is the inmates through the course of 24 hours will fill out these request – these request slips are on each living unit. They fill them out. They hand them to the correctional officer. The correctional officer then deposits those into a central security office location at the end of his or her shift. At the beginning of every CRW shift they visit the security office and obtain those documents, sort them out to whose living unit is assigned to the particular CRW then reviews those requests and provides the responses to them.

…

Q: Let me ask that with regard to a notification of this nature like we're looking at, even if we're not talking about this particular form, would there be any barrier or concern to you as a former social worker with regard to obtaining that information for an inmate?

A: No.

Q: Do you know – let me ask you this: Is that something you had ever done back when you were an actual social worker on the ground?

A: I can't remember for that time period, but the honest situation regarding this is that the releasing of property and the assistance of obtaining CPD-held property is a very natural, common occurrence at the jail that they wouldn't necessarily refer to this or need to refer it for direction on how to do it. We have regular contact with ERPS to achieve what needs to be done to release the property so we don't – even though we had access to

it, we wouldn't necessarily need to refer to it for a pro-
cedure.

Q:  Let me ask you this which is, as a supervisor would
there be any concerns that you would have with regard
to one of your CRWs getting information from Chicago
police on the web and providing it to an inmate?

A:  No, not at all.

Q:  This is a practice that's performed by all the CRWs you
supervise, correct?

A:  Correct.

That portion of Mueller's testimony is the primary basis on
which the district court relied in finding that the jail inmates
could indeed obtain access to the information on the CPD's
website, indirectly through the CRWs, if not directly on their
own.

The plaintiffs urge that this is not good enough, but they
provide no evidence that contradicts Mueller's account. They
accuse the Sheriff of misinforming the detainees in his cus-
tody, but they do not identify anyone in the class who actually
tried to gain access to the Internet in this way and was unsuc-
cessful. Plaintiff Conyers said that he never went to the CPD
website, either before, during, or after his time in jail. When
detailing his efforts to get his jewelry and cell phone back
while he was detained, he said that he did not have access to
the Internet. But that fact alone is not enough to enable him to
prevail. He might have meant only that he lacked *personal* ac-
cess and did not want to work through the CRWs, which
would be inadequate to make out a due-process claim. But
even assuming that he meant to say that he lacked access to
the Internet altogether while he was in the Jail, this statement

by itself does not do enough to counter Mueller's testimony regarding the procedures for detainee access to the Internet. Perhaps Conyers lacked access to the Internet because the CRW from whom he sought help negligently failed to follow the procedures that Mueller outlined. This, too, is not enough to support a due-process violation. See *Parratt v. Taylor*, 451 U.S. 527, 543 (1981) (a single negligent failure to follow an otherwise sound procedure does not adequately allege a violation of the Due Process Clause), overruled in part by *Daniels v. Williams*, 474 U.S. 327, 330–31 (1986).

All the district court could do, and all we can do, is to work with the record that we have. Whether Internet access in one setting or another is adequate depends entirely on the facts. The plaintiffs here did not show that they were unable to find out the details of the property-recovery process that were disclosed on the CPD's webpage. Nor did they offer enough to counteract Mueller's description of the role that the CRWs played to facilitate that access. Plaintiffs had the burden of proof on this issue, and so it was their responsibility to show why the system the Sheriff was using was constitutionally inadequate. After independently reviewing the facts presented at summary judgment, as we must, we conclude that plaintiffs did not meet that burden.

## III

In ruling for the City, we do not mean to imply that plaintiffs brought a meritless or frivolous case. Far from it: 30 days is a short time for taking all the necessary steps to retrieve property that was seized. It may be especially difficult if the detainee is forced to work through an intermediary. But we can find no support in due-process cases for the proposition that the City must serve as an involuntary bailee of property

for lengthy periods of time, incurring all of the costs and re-
sponsibilities that such a status would implicate. Nor do we
see any merit in the plaintiffs' takings or Fourth Amendment
theories. We therefore AFFIRM the judgment of the district
court.