RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0103p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

ALANA HARRISON, individually and on behalf of all
others similarly situated,

*Plaintiff-Appellant*,

> No. 20-4051

*v.*

MONTGOMERY COUNTY, OHIO,

*Defendant-Appellee*.

───────────────

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 3:19-cv-00288—Thomas M. Rose, District Judge.

Argued: April 29, 2021

Decided and Filed: May 11, 2021

Before: SUTTON, Chief Judge, SUHRHEINRICH and SILER, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Emily White, DANN LAW, Cleveland, Ohio, for Appellant. Stephen W. Funk, ROETZEL & ANDRESS, LPA, Akron, Ohio, for Appellee. Christina M. Martin, PACIFIC LEGAL FOUNDATION, Palm Beach Gardens, Florida, Michael J. Hendershot, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Amici Curiae. **ON BRIEF:** Emily White, Marc E. Dann, DANN LAW, Cleveland, Ohio, Thomas A. Zimmerman, Jr., ZIMMERMAN LAW OFFICES, P.C., Chicago, Illinois, Andrew M. Engel, ANDREW M. ENGEL CO., LPA, Dayton, Ohio, for Appellant. Stephen W. Funk, Emily K. Anglewicz, ROETZEL & ANDRESS, LPA, Akron, Ohio, Anne M. Jagielski, MONTGOMERY COUNTY, OHIO, Dayton, Ohio, for Appellee. Christina M. Martin, PACIFIC LEGAL FOUNDATION, Palm Beach Gardens, Florida, Benjamin M. Flowers, Michael J. Hendershot, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Amici Curiae.

---

**OPINION**

---

SUTTON, Chief Judge.  When an Ohio county forecloses on a tax-delinquent property, it ordinarily sells the property at an auction, keeps enough of the proceeds to cover the outstanding taxes, and returns any leftover funds to the owner.  To stem a tide of vacant homes and to transfer ownership of them more efficiently, Ohio enabled its municipalities to take another route when it comes to abandoned tax-delinquent property.  Instead of selling the property and collecting the taxes owed, counties may surrender their tax interest and transfer the property with clear title to land banks.  The land banks may revitalize the abandoned property, sell it to a private buyer, or demolish the home to pave the way for new neighborhoods.  No auction occurs when counties choose the land bank route, and any surplus equity held by the original owner vanishes.

Alana Harrison inherited a partial interest in her mother's home in Dayton.  Due to a nearly $20,000 property tax delinquency, Montgomery County's treasurer started foreclosure proceedings in 2017.  The County Board of Revision handled the foreclosure and transferred the home to the County's land bank.  The home had an estimated fair market value of $22,600 at the time of the transfer, roughly $3,000 more than the property taxes owed.  Harrison never received the surplus equity because the statute offers no way to pay it.

Harrison filed an action against Montgomery County under the Takings Clause of the Fifth (and Fourteenth) Amendment of the United States Constitution.  On top of seeking relief for herself, she also sought relief on behalf of a purported class of similarly situated landowners.  The County moved to dismiss her claim, arguing that claim preclusion barred Harrison's lawsuit because she could have raised a federal takings claim at several points during the foreclosure process.  The district court agreed.  In view of the intricate issues presented and the potential invalidity of an Ohio law, we solicited the participation of the Ohio Attorney General, whose office helpfully filed an *amicus* brief and participated in the oral argument in support of the County.  We now reverse.

I.

A.

Ohio empowers county treasurers to bring foreclosure actions against tax-delinquent properties. *See* O.R.C. § 323.25. The county treasurer may "enforce the lien for the taxes" on the delinquent land "in the same way mortgage liens are enforced": by filing a lawsuit. *Id.* A judicial foreclosure proceeding typically follows, after which the county sells the land at a public auction, the proceeds of which cover the tax delinquency. *Id.* § 323.73. If the sale produces leftover proceeds, the county "shall pay such excess to the owner" upon demand. *Id.* § 5721.20. In this way, Ohio protects the county's interest in collecting property taxes and the owner's interest in keeping any surplus equity.

In 2008, Ohio law introduced a new option for handling property taxes owed on abandoned land, defined as "delinquent lands or delinquent vacant lands . . . that are unoccupied." *Id.* § 323.65. Instead of using "judicial foreclosure proceedings," Ohio enables "a county board of revision" to "foreclose the state's lien for real estate taxes upon abandoned land." *Id.* § 323.66. The state law then authorizes counties to transfer the land to authorized land banks rather than dispose of the property at auctions. *Id.* § 323.78.

This innovation allows counties to embark on land revitalization efforts more efficiently. If the county treasurer invokes this approach and if there is a willing land bank, the process allows the county to transfer the abandoned land directly to the land bank. *Id.* § 323.78(B). With the transfer, the land becomes "free and clear of all impositions and any other liens on the property, which shall be deemed forever satisfied and discharged." *Id.* The State does not collect any tax delinquency, and the fair market value of the land becomes irrelevant, as it makes no difference whether the tax impositions and costs of the action "exceed the fair market value of the parcel." *Id.*

State law offers some protections for the owners of abandoned land. The Board must provide notice to landowners, *id.* § 323.66, and the county must run a title search "for the purpose of identifying . . . persons hav[ing] a legal or equitable ownership interest," *id.* § 323.68(A)(1). Once notified of the action, owners may transfer a case from the Board to a

"court of common pleas or to a municipal court with jurisdiction" to handle any state or federal challenges to the foreclosure. *Id.* §§ 323.691(A)(1); 323.70(B). By paying all outstanding taxes, owners also may terminate the proceeding before the Board and get their land back. *Id.* § 323.72.

After the Board's decision, homeowners have other options. They have 28 days after the decision to pay the outstanding tax delinquency and recover the land. *Id.* § 323.65(J). They also may "file an appeal in the court of common pleas," Ohio's trial court of general jurisdiction. *Id.* § 323.79. In addition to "issues raised or adjudicated in the proceedings before the county board of revision," the owners may surface "other issues that are raised for the first time on appeal and that are pertinent to the abandoned land." *Id.*

The one option the landowner does not have under the statute is to obtain any excess equity in the property after it goes to the land bank. The Ohio statute offers no way to capture that property interest.

B.

In 2017, Montgomery County's treasurer filed a foreclosure action in the County's Board of Revision against two parcels of land located in Dayton that were in arrears and titled to Alana Harrison's deceased mother. Harrison held a one-half interest in the property. Harrison answered the complaint, saying she was "new to this" and wanted "to save my mom[']s home." R.17-4 at 1.

The Board foreclosed the property. It found the two parcels to be abandoned and directed that the property be transferred to the land bank after the 28-day redemption period. The Board found that the tax impositions totaled $19,664 and that the property's fair market value equaled $22,600, meaning Harrison retained a surplus equity interest just shy of $3,000. As for the costs of the foreclosure action, the Board ordered that the "Clerk of Courts shall pay from the Transferee's deposited funds" $1,883 for court costs, $125 for a sheriff's fee, $1 to the county auditor, and $36 for a county recorder fee. R.17-5 at 3. That is a total of $2,045, leaving roughly $891 from the net surplus. The statute directs that these costs be paid by the county treasurer at his or her "discretion" and "in whole or in part from the delinquent tax and assessment collection

funds" or by the "community development organization." O.R.C. § 323.75(B)(2). Harrison did not appeal this administrative decision in state court. Nor did she file a writ of mandamus to compel the County to condemn her property and pay compensation, the route Ohio offers to property owners to bring state law takings claims. *See State ex rel. Shemo v. Mayfield Heights*, 765 N.E.2d 345, 350 (Ohio 2002) ("Mandamus is the appropriate action to compel public authorities to institute appropriation proceedings where an involuntary taking of private property is alleged."); *see also Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2168 (2019) (noting that all States, "besides Ohio," permit property owners to bring "a state inverse condemnation action," instead of a mandamus action, to handle an uncompensated taking of property).

She instead filed this action in federal court, alleging that the County violated the federal and state takings clauses by extinguishing her surplus equity interest without providing just compensation. According to her complaint, the County since 2011 "has commenced nearly 3,200 delinquent tax foreclosure cases" before the Board of Revision. R.15 at 6. And "in virtually every case . . . the real property was transferred directly to the Land Bank or an electing subdivision." *Id.* In 85% of the cases, Harrison alleges, the fair market value of the seized property exceeded the taxes owed.

Montgomery County filed a motion to dismiss the case for failure to state a claim. The district court granted the motion on claim-preclusion grounds because Harrison could have appealed the Board's decision and brought her takings claim before the court of common pleas.

II.

*Ohio claim preclusion law*. Through the full faith and credit statute, 28 U.S.C. § 1738, Congress has established that, in a federal court action like this one, a "state-court judgment" receives "the same preclusive effect" that it would receive under state law. *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984). Under Ohio law, "a valid, final judgment rendered upon the merits bars all subsequent actions based upon any claim arising out of" the same "transaction or occurrence." *Grava v. Parkman Twp.*, 653 N.E.2d 226, 229 (Ohio 1995). Claim preclusion under Ohio law requires (1) a prior decision and (2) a second action between the same parties (3) that involves claims that were or could have been litigated, and (4) that arise

out of the same "transaction or occurrence" as the first lawsuit. *Hapgood v. City of Warren*, 127 F.3d 490, 493 (6th Cir. 1997).

This case turns on the third requirement, that a plaintiff may not bring a claim that "could have been litigated in the previous suit." *O'Nesti v. DeBartolo Realty Corp.*, 862 N.E.2d 803, 806 (Ohio 2007). Some boundaries and easements give contour to this requirement. It is "predicated on the assumption" that the litigant does not face "barriers" to presenting the full claim to the prior court in a single action. Restatement (Second) of Judgments § 26 cmt. c (Am. Law Inst. 1982); *Grava*, 653 N.E.2d at 229 (following the modern Restatement approach). When impediments exist or when the opportunity to raise the federal claim had not yet arisen in the prior state court action, "it is unfair to preclude" a litigant from bringing another action that raises "phases of the claim" that he "was disabled from presenting in the first" action. Restatement § 26 cmt. c; *see Ohio Kentucky Oil Corp. v. Nolfi*, 5 N.E.3d 683, 690 (Ohio Ct. App. 2013).

*Federal takings law*. One complication with applying Ohio claim preclusion law to the County's foreclosure action against Harrison is that federal takings law changed during the operative period. Under the prior regime, the Supreme Court imposed two ripeness requirements before a takings claim could proceed in federal court. First: There must be a "final decision" to take property. *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985). Second: The plaintiff must "seek compensation" in state court. *Id.* at 194. The Court eventually made clear that "parties should not be permitted to relitigate issues that have been resolved" by state courts, including takings claims. *San Remo Hotel, L.P. v. City and Cnty. of San Francisco*, 545 U.S. 323, 336–38 (2005). Taken together, *San Remo* and *Williamson County* closed the door on bringing federal takings claims in federal district courts. After plaintiffs sought compensation for any taking in state courts (as *Williamson County* required), they faced claim preclusion problems once the state court litigation ended (as *San Remo* required).

Under this regime, the County would have had a powerful claim preclusion argument against Harrison. Her federal takings claim would have become ripe only after the Board decided to foreclose on her property interest *and* she sought compensation through the

procedures Ohio offered. She might have tried to argue that "no adequate state procedures existed" to challenge the State's taking, but those types of arguments usually hit a wall. *See, e.g.*, *Wayside Church v. Van Buren Cnty.*, 847 F.3d 812, 818 (6th Cir. 2017). That would have left us bound to give claim-preclusive effect to whatever decision the state process produced. Under the old regime, any decision by Harrison not to seek relief in the state courts would have doomed her federal claim.

But a recent decision uprooted that process. *Knick v. Township of Scott* dispensed with the requirement that a federal takings plaintiff must first exhaust all state remedies before seeking relief in federal court. 139 S. Ct. at 2167–68. Because such state decisions later became claim preclusive in federal court under *San Remo*, *Knick* realized that the system created a "Catch-22" for takings claimants. *Id.* at 2167. They "cannot go to federal court without going to state court first," but if they lose in state court, their "claim will be barred in federal court." *Id.*; *see San Remo*, 545 U.S. at 338. To fix the problem, *Knick* eliminated *Williamson County*'s second requirement, that takings plaintiffs must first seek compensation in state court. *Knick*, 139 S. Ct. at 2170. But it left in place the requirement that there must be a "final decision" to take property, *id.* at 2169, meaning that it is "known to a reasonable degree of certainty" what will happen to the property, *Palazzolo v. Rhode Island*, 533 U.S. 606, 620 (2001). The upshot? A property owner today may bring a § 1983 federal takings claim in federal court "as soon as their property has been taken." *Knick*, 139 S. Ct. at 2170.

*Application of Ohio claim preclusion law to Harrison's federal takings claim*. *Knick* permits this action, and Ohio claim preclusion law does not bar it. Harrison may seek recourse in federal court for this alleged taking under at least two ways of thinking about it.

1. One explanation turns on the way a federal takings claim now works after *Knick*. The County agrees that, if it applied the land bank foreclosure statute to a piece of property today, the property owner could file a § 1983 action in federal court under the Takings Clause after the Board transferred the property to a land bank. In view of *Knick*, the property owner no longer would need to invoke any potential state procedures for receiving compensation for the taking. She could go directly to federal court at that point.

As it happens, that is just what occurred here. Harrison did not invoke the state procedures for challenging the Board's decision to transfer her property to a land bank. She did nothing. Nothing, that is, until the U.S. Supreme Court decided *Knick* roughly 10 months later. With that change in law in place, she filed this federal action three months later. That delay, it is true, might implicate a statute of limitations defense. But the County did not raise that defense, perhaps in view of the shifting legal landscape. Until *Knick* came down in June of 2019, Harrison had no federal court leg to stand on. All in all, what seems to be the County's view of when a future federal takings claim would be ripe for filing in federal court applies to today's claim.

2. Another explanation for this outcome turns on the State's (and County's) view of when Harrison *could* have filed her federal takings claim earlier in the state court proceedings in this case. As they see it, Harrison had two early opportunities to invoke a federal takings defense in response to the County's foreclosure action—first when the County filed its foreclosure complaint against the property, second when the action went to the Board and state law gave her an option to remove the case to the state court of common pleas. At either step, they point out, Harrison could have inserted a federal takings defense, and her failure to do so then bars her efforts to do so now under Ohio claim preclusion law.

But this argument runs into a claim preclusion imperative, that litigants do not face "barriers" to presenting their claims in the first action. Restatement § 26(c) cmt. c. Whether under *Williamson County* or *Knick*, her federal takings claim was not ripe until the Board's final decision to transfer the property to the land bank. Only when the Board transferred the property to the land bank did Harrison have a "ripe" takings claim because, before then, the County had not reached a "final decision" to seize title to her land, a feature of *Williamson County* that remains in place after *Knick*. *See Williamson Cnty.*, 473 U.S. at 186; *Knick*, 139 S. Ct. at 2169. Until that moment, in other words, Harrison could not seek relief in federal court under § 1983, no matter what the state procedures permitted.

The County's view that Harrison had to file a federal takings defense in response to the complaint or immediately seek relief in the court of common pleas might have worked in some settings under the *Williamson County/San Remo* approach. But *Knick* recasts that story. Were it

true that claim preclusion bars Harrison's federal takings claim because she could have raised it at the outset of the state foreclosure action, that would create an end run around *Knick*. It would mean that the one time a property owner could raise a federal takings claim in federal court—only after a "final decision"—would be too late, and claim preclusion would apply all the same. That is the same kind of "preclusion trap" that *Knick* tried to eliminate. 139 S. Ct. at 2174.

For like reasons, Harrison had no obligation to invoke the federal takings clause before the Board of Revision to stop title transfer in the first place. In the State's view, she should have answered the foreclosure complaint by arguing that the takings clause barred transferring title to the property. But, again, this approach shortchanges the reality that *Williamson County*'s first requirement—that there be a "final decision" effecting a taking—remains in place after *Knick*. The taking, so far as federal law is concerned, happened when the Board adjudicated the foreclosure of Harrison's property through the land bank process, not before.

Besides, how could Harrison have known to bring a takings-based defense in the first place? The Board did not find that her home's value outstripped the total delinquent taxes until it decided the foreclosure action. The final decision came a year after the County treasurer brought proceedings and nearly ten months after Harrison answered the complaint. Consider, too, that in the foreclosure complaint, the County Treasurer asked that the property "be sold according to law" *or* that it be "conveyed to a township." R.17-2 at 7. As the County concedes, its complaint did not establish that Harrison's property would be transferred to a land bank. *See* Appellant's Br. at 7. Had the County sold the property at a public auction, Ohio law would have permitted Harrison to recover any surplus. *See* O.R.C. § 5721.20. Until it became clear the State would seize Harrison's surplus equity by transferring title—a decision reached only when the Board adjudicated the foreclosure—no taking occurred. *See Williamson Cnty.*, 473 U.S. at 186.

Harrison is not the first property owner to face this problem in the States of our circuit. In *Wayside Church v. Van Buren County*, a pre-*Knick* decision, we held that the failure to exhaust state remedies barred a takings claim to recover surplus equity after a Michigan tax foreclosure sale. 847 F.3d at 822. The County sold the property for $206,000 to satisfy a $16,750 tax delinquency and refused to refund the surplus. *Id.* at 815. "In some legal precincts that sort of behavior is called theft." *Id.* at 823 (Kethledge, J., dissenting). The now-defunct

state exhaustion requirement might have barred relief in *Wayside*. But it poses no barrier after *Knick*.

The County's other arguments do not alter this conclusion. *Moore v. Hiram Township*, for one, does not advance its position. 988 F.3d 353 (6th Cir. 2021). It held that federal constitutional claims may be raised on appeal of an administrative decision in Ohio's court of common pleas. But whether Harrison could have raised her takings claim on appeal is a far cry from insisting she *had to*. Moore appealed the State's administrative decision, arguing that it violated his federal constitutional rights. *See id.* at 356. Our decision as a result holds only that, if a plaintiff chooses to pursue an administrative appeal, claim preclusion may bar a later attempt to seek the same relief. But because Harrison did not pursue an administrative appeal, that sets her case apart. While "Moore's current constitutional challenges were in fact litigated in his first suit," *id.* at 361, Harrison's were not.

Nor does *Carroll v. City of Cleveland*, a pre-*Knick* case, point the other way. 522 F. App'x 299 (6th Cir. 2013). It addressed federal constitutional claims brought against the City of Cleveland for the imposition of traffic fines. *Id.* at 301. The plaintiffs paid the fines "rather than contesting their citations through the appellate process that the ordinance provided." *Id.* Ohio claim preclusion law, we held, barred their claims. *Id.* at 303–05. "Although the administrative-hearing officer, under Ohio law, does not have the authority to resolve . . . constitutional claims," we noted, "the court of common pleas certainly could, on review of the administrative decision." *Id.* at 305. But *Carroll* came down before *Knick* eliminated the state-exhaustion requirement for takings claims. Unpublished decisions of our court do not bind us, all the more so when they conflict with intervening precedents of the Supreme Court. *See Michael v. Ghee*, 498 F.3d 372, 381 & n.4 (6th Cir. 2007).

*Tax Injunction Act.* The Tax Injunction Act provides that district courts "shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had" in state court. 28 U.S.C. § 1341. By its terms, the Act bars only challenges to the "assessment, levy or collection" of taxes. *Id.* at 105 n.7. "'[C]ollection' is the act of obtaining payment of taxes due." *Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 10 (2015) (quotation omitted).

Harrison does not challenge Ohio's "collection" of delinquent taxes. 28 U.S.C. § 1341. She does not seek to halt foreclosures of tax-delinquent property or even to get her home back. Harrison challenges only Ohio's seizure of surplus equity, an amount in excess of taxes owed. Because Ohio's seizure and extinguishment of surplus equity is not an "act of obtaining payment of taxes due," *Brohl*, 575 U.S. at 10, the Act does not bar Harrison's claims.

*Freed v. Thomas* all but settles the issue. 976 F.3d 729 (6th Cir. 2020). It considered whether the Tax Injunction Act barred claims brought by a Michigan plaintiff after the state seized surplus proceeds from the sale of his foreclosed property. *See id*. at 732. Because Freed did not "seek to anticipatorily restrain collection of a state tax" and instead brought claims stemming from the State's "*post-collection* actions, specifically Michigan's refusal to refund the excess proceeds," the Act did not apply. *Id.* at 735. Today's case is further afield from the Act's coverage. Whereas Michigan collected taxes following a foreclosure sale in *Freed*, Montgomery County did not even collect the taxes owed by Harrison because it transferred clear title to her property to a land bank.

*Comity*. Just as the Tax Injunction Act bars claims for injunctive and declaratory relief, comity principles restrain plaintiffs from "asserting § 1983 actions against the validity of state tax systems in federal courts." *Fair Assessment in Real Estate Ass'n v. McNary*, 454 U.S. 100, 116 (1981). But just as the Act does not bar Harrison's claims, neither do these comity principles compel abstention. *See Freed*, 976 F.3d at 737. As we have said, "takings suits in federal courts to recover excess equity as a result of state tax foreclosure sales do not violate the principle of judicial federalism." *Id.* Harrison's suit is a close analog. Because she challenges only Ohio's extinguishment of her surplus equity—not its foreclosure of tax-delinquent property—her use of § 1983 does not run afoul of comity principles.

That leaves the merits of Harrison's federal takings claim, which implicates debates going back to the founding. On the one hand, in the words of Justice Chase, Harrison's argument rests on the venerable proposition that "a law that takes property from A. and gives it to B . . . is against all reason and justice." *Calder v. Bull*, 3 U.S. 386, 388 (1798). "If, on the other hand," in the words of Justice Iredell, "the Legislature . . . shall pass a law, within the general scope of their constitutional power, the Court cannot pronounce it to be void, merely

because it is, in their judgment, contrary to the principles of natural justice.  The ideas of natural justice are regulated by no fixed standard:  the ablest and the purest men have differed upon the subject; and all that the Court could properly say, in such an event, would be, that the Legislature (possessed of an equal right of opinion) had passed an act which, in the opinion of the judges, was inconsistent with the abstract principles of natural justice."  *Id.* at 399.  As a court that specializes in sequels, not premiers, we think it prudent to allow the district court to consider the merits of this claim in the first instance.  In doing so, it may wish to solicit historical evidence about the meaning of a taking in 1791 and 1868 with respect to this kind of government action. Should either party appeal the district court's ruling, this panel stands ready to handle the appeal promptly.

For these reasons, we reverse and remand the case to the district court to consider Harrison's takings claim in the first instance.