RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0176p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

ESTATE OF ISAIAH ANDREWS,

        *Plaintiff-Appellant*,

    *v.*

CITY OF CLEVELAND, OHIO; ESTATE OF WILLIAM HUBBARD; ESTATE OF ERNEST ROWELL,

        *Defendants-Appellees*.

No. 23-3387

─────────────

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
No. 1:22-cv-00250—James S. Gwin, District Judge.

Argued:  May 28, 2024

Decided and Filed:  August 13, 2024

Before:  SUTTON, Chief Judge; CLAY and BUSH, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:**  Elizabeth Bonham, FRIEDMAN, GILBERT + GERHARDSTEIN, Cleveland, Ohio, for Appellant.  William M. Menzalora, CITY OF CLEVELAND, Cleveland, Ohio, for Appellee City of Cleveland.  John D. Latchney, HANNA, CAMPBELL & POWELL, LLP, Akron, Ohio, for Appellees Estate of Ernest Rowell and Estate of William Hubbard.  **ON BRIEF:**  Elizabeth Bonham, Sarah Gelsomino, FRIEDMAN, GILBERT + GERHARDSTEIN, Cleveland, Ohio, Jacqueline Greene, M. Caroline Hyatt, FRIEDMAN, GILBERT + GERHARDSTEIN, Cincinnati, Ohio, for Appellant.  William M. Menzalora, Elena N. Boop, Gilbert E. Blomgren, Matthew R. Aumann, Michael A. Arnold, CITY OF CLEVELAND, Cleveland, Ohio, for Appellee City of Cleveland.  John D. Latchney, Kenneth A. Calderone, HANNA, CAMPBELL & POWELL, LLP, Akron, Ohio, for Appellees Estate of Ernest Rowell and Estate of William Hubbard.

      SUTTON, C.J., delivered the opinion of the court in which BUSH, J., joined.  CLAY, J. (pp. 14–21), delivered a separate opinion concurring in part and dissenting in part.

———————————

**OPINION**

———————————

SUTTON, Chief Judge. Isaiah Andrews spent nearly 46 years in prison for the alleged 1974 murder of his wife. After an Ohio court determined that the government failed to turn over key exculpatory evidence, Ohio granted Andrews a new trial, and a new jury found him not guilty. He filed a § 1983 suit against the City of Cleveland and some of the officers involved with his case. The district court rejected his claims as a matter of law. It found that Andrews had waited too long after his release to file this lawsuit against the deceased officers, and that he failed to show that it was the police rather than the prosecutors who violated his rights. We affirm on the first issue and reverse and remand on the second.

I.

Sometime between 7:00 am and 2:00 pm on September 18, 1974, someone fatally stabbed Regina Andrews. Cleveland police found her body in a park wrapped in bed linens. The scene offered some clues. A nearby newspaper showed a bloody palm print, and a blood-stained pillowcase carried a tag from Howard Johnson's Motor Lodge.

Officers went to the Howard Johnson's motel. The desk clerk told police that bed linens were missing from the room of Willie Watts. The next morning, police arrested Watts for Regina's murder. His custody did not last long. The police released Watts after he established an alibi for the morning of September 18.

The police identified Regina's husband, Isaiah Andrews, as another suspect. No physical evidence linked him to the scene. But the State had recently released Andrews for a previous murder, he admitted to arguing with Regina shortly before her death, and his polygraph results and alibi did not add up. An Ohio grand jury indicted Andrews for murder, and a jury found him guilty in 1975. He received a life sentence.

During the next 45 years, Andrews periodically pursued postconviction relief in state court. In 2020, the State granted Andrews a new trial after finding that he never received

exculpatory evidence concerning Watts.  In October 2021, the new jury found Andrews not guilty.

On February 14, 2022, Andrews filed this § 1983 action against the lead detectives, William Hubbard and Ernest Rowell, eight other officers, and the City of Cleveland.  The lawsuit alleged that the officers and the City violated Andrews' Fourteenth Amendment right to due process by withholding exculpatory evidence.  Because Hubbard, Rowell, and some of the other officers had died by the time of the lawsuit, the district court allowed Andrews to substitute the common administrator of their estates as the defendant.  When Andrews died later in 2022, the court permitted his estate administrator to litigate the case.

The district court ruled as a matter of law for all of the defendants.  It dismissed the claims against the Hubbard and Rowell estates because Andrews had waited too long to bring his claims against them.  *See* Ohio Rev. Code § 2117.06.  And it granted summary judgment in favor of the City of Cleveland because its police, as opposed to the prosecutor, did not withhold exculpatory evidence.

II.

Andrews' estate argues that the district court erred in dismissing the § 1983 claim against the Hubbard and Rowell estates on timeliness grounds.  We review this legal argument with fresh eyes.  *Sampson v. Garrett*, 917 F.3d 880, 881 (6th Cir. 2019).

Federal civil rights laws play a key role in the balance between national and state authority.  Perhaps the most pivotal of these laws, 42 U.S.C. § 1983 creates a cause of action to vindicate federal rights against state officials and governments.  At the same time that federal law creates this action, it leaves state law to fill in the gaps over how these actions work.  *See Bd. of Regents of Univ. of State of N.Y. v. Tomanio*, 446 U.S. 478, 483–84 (1980).  When federal law is "deficient" in explaining how an action works, state law governs the proceedings as long as it "is not inconsistent with the Constitution and laws of the United States."  42 U.S.C. § 1988(a).

In thinking about whether federal law incorporates state law with respect to a cause of action, three questions come into play.  Does a "suitable federal rule exist[]" or has Congress left

a gap for state law to fill?  *Wilson v. Garcia*, 471 U.S. 261, 267 (1985) (quotation omitted).  If a gap exists, what is the "most analogous" state rule?  *Id.* at 267–68.  Is the state rule "inconsistent with the Constitution and laws of the United States"?  *Id.* at 267 (quotation omitted).

As to the first question, federal law does not tell us what to do when a plaintiff or a defendant in a § 1983 action dies.  "[O]ne specific area not covered by federal law is that relating to the survival of civil rights actions under § 1983 upon the death of either the plaintiff or defendant."  *Robertson v. Wegmann*, 436 U.S. 584, 589 (1978) (quotation omitted).  States have traditionally regulated the "type of claims that survive and the parties as to whom survivorship is allowed."  *Id.*; *see, e.g.*, *United States v. Hoar*, 26 F. Cas. 329 (Story, Circuit Justice, C.C.D. Mass. 1821) (No. 15,373); *In re Broderick's Will*, 88 U.S. 503, 517 (1874); *cf. Sutton v. English*, 246 U.S. 199, 205 (1918) (explaining that estate administration has traditionally been reserved to the States).

As to the second question, we look to the forum State, Ohio, to determine how to proceed.  "All creditors having claims against an estate," Ohio law says, must present their claims "within six months after the death of the decedent."  Ohio Rev. Code § 2117.06(A), (B).  Otherwise, "[n]o payment shall be made on the claim and no action shall be maintained on the claim."  *Id.* § 2117.06(C).  Ohio grants an extension to creditors bringing "contingent claims" against an estate administrator.  *Id.*  "If a claim is contingent at the time of a decedent's death and a cause of action subsequently accrues on the claim, it shall be presented to the executor or administrator, in the same manner as other claims, before the expiration of six months after the date of death of the decedent, or before the expiration of two months after the cause of action accrues, whichever is later[.]"  *Id.* § 2117.37.  If a contingent claim ripens against an estate more than six months after the decedent's death, in other words, the creditor still has two months to present his claim to the administrator.  These provisions of Ohio law, all agree, form the relevant state law backdrop and deal with the reality that officer Hubbard died in 2009 and officer Rowell died in 2015.

As to the third question, these Ohio principles are not "inconsistent with the Constitution and laws of the United States."  It is not inconsistent with federal policy for a State to say that a cause of action abates when a party dies, or to forbid the substitution of the deceased with their

personal representative.  *Robertson*, 436 U.S. at 590–92; *see also Moor v. Alameda County*, 411 U.S. 693, 702 n.14 (1973).  Confirming the point, several federal statutes "take the same approach" to survival and do not allow the substitution of a deceased party's personal representative.  *Robertson*, 436 U.S. at 592 n.8.

The greater state power upheld in *Robertson*—to end a cause of action based on the claimant's death—includes the lesser power to require the timely presentation of claims before proceeding against an estate administrator.  As in *Robertson*, Ohio law leaves open the possibility that claims might survive against parties other than the deceased's personal representatives—here to account for the deaths of Hubbard and Rowell in 2009 and 2015.  *See* Ohio Rev. Code § 2117.39.  Ohio law does not cut off the ability of claimants in Andrews' shoes to bring a § 1983 suit.  Indeed, it allowed claims to be filed upon accrual—in one instance twelve years after the officer died and in the other instance six years after the officer died.  What it does do is require the prompt filing of the claims after they accrue—in this instance in 2021 when Andrews was acquitted.

Put another way, once an estate has been wrapped up and a final distribution has been made, Ohio law allows a creditor with a contingent claim to proceed directly "against the distributees of the decedent's estate" without presentation to them or to the estate administrators. *Id.*; *see also id.* § 2117.41 (providing that heirs are liable for paying contingent claims of the estate "in an amount not exceeding the value of the . . . property that the person received under the will"); *id.* § 2117.42 (specifying how to proceed when there are multiple heirs).  Nothing in federal law requires states to permit plaintiffs to name estate administrators, instead of heirs, as defendants.  *See Robertson*, 436 U.S. at 591; *cf.* Fed. R. Civ. P. 17(b)(3) ("Capacity to sue or be sued is determined . . . by the law of the state where the court is located . . . .").  This Ohio law is not inconsistent with federal law.

Under Ohio law, Andrews may not maintain this § 1983 lawsuit against the administrator of Hubbard and Rowell's estates.  Hubbard and Rowell died long before Andrews brought an action against them.  And Andrews did not present his claims to the estate administrator within six months of Hubbard and Rowell's deaths in 2009 and 2015, Ohio Rev. Code § 2117.06(B), or within two months of when he was found not guilty (when the parties agree that his *Brady* claim

accrued, Appellant's Br. 37, R.89 at 758), *id.* § 2117.37. Andrews therefore cannot proceed against the estates' administrator. *See id.* § 2117.06(C).

Andrews mounts several responses, one under Ohio law, a few under federal law.

Pointing to Ohio law, Andrews argues that he did not bring a "claim[] against an estate," *id.* § 2117.06, because the City would pay any judgment against Hubbard and Rowell. Under Ohio law, it is true, a claim that has not been properly presented to the estate administrator may nonetheless go forward so long as "no portion of any recovery on a claim . . . shall come from the assets of an estate." *Id.* § 2117.06(G); *Meinberg v. Glaser*, 237 N.E.2d 605, 609 (Ohio 1968). But that carve-out does not help him because Andrews raises a claim for monetary damages against the estates, not just the City. And the possibility that the estates might seek indemnification does not establish that "no portion of any recovery" would come from the estates. Ohio promises to indemnify its employees under certain conditions, Ohio Rev. Code § 2744.07, but it clarifies that the "right of indemnification is personal to the employee," *Ayers v. Cleveland*, 156 N.E.3d 848, 292–93 (Ohio 2020). The indemnification statute "does not permit a judgment creditor" (like Andrews) "to proceed directly against an indemnitor" (like Cleveland). *Id.* at 293. Even if Andrews may wish to draw on Cleveland's coffers, the only path to those funds proceeds through an obligation of Hubbard and Rowell's estates. *See* Ohio Rev. Code § 2744.07 ("[A] political subdivision shall indemnify and hold harmless an employee in the amount of any judgment, other than a judgment for punitive or exemplary damages, that is *obtained against the employee . . . .*" (emphasis added)).

What's more, even if Andrews did obtain a judgment against Hubbard and Rowell, it's not clear that the City would indemnify them. Put to one side the argument that, under Ohio law, a political subdivision must indemnify "the employee[s]," not necessarily their estates. *Id.*; *see id.* § 2744.01 ("'Employee' means an officer, agent, employee, or servant . . . ."); *Ayers*, 156 N.E.3d at 292. The Ohio indemnification statute still covers only an employee's "act[s] or omission[s] in connection with a governmental or proprietary function," Ohio Rev. Code § 2744.07(A)(1), if at the time of the "act[s] or omission[s]" the employee was acting "in good faith" and within the scope of employment or official responsibilities, *id.* § 2744.07(A)(2). Should a jury conclude that Hubbard and Rowell withheld the evidence from the prosecution and

that they did so in *bad faith* or *outside the scope of employment*, their estates would be liable to Andrews but have no right of indemnification against the City. Because Andrews seeks a remedy that might require the estates to pay the price, he must follow Ohio's timelines for making claims on an estate.

As to federal law, Andrews argues that Ohio's estate administration deadlines violate "the Constitution and laws of the United States" because they stand as an obstacle to prevailing in a federal civil rights claim. 42 U.S.C. § 1988. In doing so, he specifically invokes *Burnett v. Grattan*, 468 U.S. 42 (1984), and *Felder v. Casey*, 487 U.S. 131 (1988).

But a statute does not become "'inconsistent' with federal law merely because the statute causes the plaintiff to lose the litigation." *Robertson*, 436 U.S. at 593. And neither *Burnett* nor *Felder* supports his theory.

*Burnett* did not involve inconsistency with federal law. It concerned whether the best analog under state law was a Maryland six-month limitation on initiating administrative employment discrimination proceedings. 468 U.S. at 45, 49–50. The Court held that the Maryland administrative proceedings offered an inapt analogy to § 1983 proceedings. *Id.* at 55. The better analogy, the Court later concluded, was a state statute of limitations for personal injury claims. *See Owens v. Okure*, 488 U.S. 235, 240–41, 251 (1989). *Burnett* speaks to how to pick between competing provisions of state law. It does not tell us whether state law violates federal law.

*Felder* is afield in other ways. It concluded that § 1983 preempted Wisconsin from requiring parties to provide prompt written notice of their claims before they could sue the state government or its agents. 487 U.S. at 135–36. This provision, *Felder* reasoned, conflicted with the "design and effect" of § 1983 because it served primarily to shield state subdivisions from "large liability and defense costs." *Id.* at 141, 143. The targeted harm Wisconsin sought to deter, in short, was precisely what § 1983 sought to permit. Instead of a "neutral, uniformly applicable state rule," it "discriminate[d]" against "only those persons who wish to sue governmental defendants" by requiring them and them alone "to provide notice." *Id.* at 141, 144, 146.

In telling contrast, the relevant Ohio law applies to all lawsuits and serves to further the efficient, timely, and fair administration of estates, something federal and state law have long promoted. *See In re Broderick's Will*, 88 U.S. at 509; *In re Natherson's Estate*, 134 N.E.2d 852, 855 (Ohio Ct. App. 1956); *The Ohio Sav. Ass'n v. Friedman*, No. 40001, 1980 WL 354413, at *2 (Ohio Ct. App. Jan. 4, 1980). Ohio applies these estate administration provisions equally to all creditors with contingent claims, regardless of whether the defendants are government employees or private parties, and regardless of whether the cause of action sounds in civil rights litigation, contract, tort, or something else. As with the survivorship statute in *Robertson*, no official clued into Ohio estate administration law would "be influenced in his behavior by its provisions." 436 U.S. at 592. This "neutral, uniformly applicable state rule" satisfies § 1988, *Felder*, and *Robertson*. *See Felder*, 487 U.S. at 144.

Nor is *Robertson* distinguishable. True, *Robertson* specifically concerned whether a § 1983 claim would abate following *plaintiff's* death rather than a *defendant's*. *See* 436 U.S. at 587. Its reasoning, however, explicitly deals with "the death of either the plaintiff or defendant." *Id.* at 589 (quotation omitted); *see also id.* (explaining that state survivorship statutes may "vary widely" when it comes to "the parties as to whom survivorship is allowed," but they all "modify" the "common law rule[]" that "[a]n injured party's personal claim was always extinguished upon the death of either the injured party himself or the alleged wrongdoer" (quotation and alterations omitted)). Nor is there any reason to think that the Ohio statute will necessarily extinguish claims more often than the Louisiana statute. Just as Louisiana law allowed an action to survive for a year "in favor of a spouse, children, parents, or siblings," *id.* at 591–92; *Shaw v. Garrison*, 391 F. Supp. 1353, 1361 n.13 (E.D. La. 1975) (citing La. Civil Code art. 2315 (1971)), so Ohio law also allows an action to survive against a deceased defendant's estate for two months, Ohio Rev. Code § 2117.37, and against his "heirs, next of kin, surviving spouse as next of kin, devisees, and legatees" for six months, *id.* § 2117.41. "[F]ew persons are not survived by one of the[] close relatives" named in the Louisiana statute, *Robertson*, 436 U.S. at 591–92, and even fewer are not survived by any of the broad categories of people covered by the Ohio statute, *see* Ohio Rev. Code § 2117.41.

Nor does *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229 (1969), change things. *Sullivan* explained that, even though federal law does not specify that damages are available in a § 1982 claim, § 1988 permits "both federal and state rules on damages" to be "utilized, whichever better serves the policies expressed in the federal statutes." *Id.* at 240. This general statement from *Sullivan* does not contradict *Robertson*'s clear holding that state survivorship statutes are consistent with the policies of the civil rights statutes. For that reason, not surprisingly, Andrews' appellate briefs never invoke *Sullivan*.

The district court correctly held that Andrews could not proceed against Hubbard and Rowell's estate administrator.

III.

Andrews separately argues that the district court erred in summarily rejecting his claim against the City of Cleveland. We give fresh review to this claim and draw all reasonable factual inferences in favor of Andrews. *See Peffer v. Stephens*, 880 F.3d 256, 262 (6th Cir. 2018).

A criminal defendant suffers a due process violation when the prosecution fails to turn over favorable evidence that would materially aid in his defense. *See Brady*, 373 U.S. at 87. Police share this obligation. Just as prosecutors must make *Brady* disclosures to the defendant, police bear "an equally important *Brady*-derived responsibility to turn over potentially exculpatory evidence to the prosecutor's office." *Moldowan v. City of Warren*, 578 F.3d 351, 381 (6th Cir. 2009) (quotation omitted). Cities do not face vicarious liability for the acts of their employees. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978). But a city will face liability under § 1983 if it implements an unconstitutional policy that causes a *Brady* violation. *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019).

At stake is whether the police suppressed two exculpatory pieces of evidence and, if so, whether they did so in connection with an unconstitutional policy of the City of Cleveland. The two pieces of evidence are (1) notes about a bloody palm print and (2) a missing page from a police report. Each one deserves a turn.

*Handprint Notes*.  Recall that the police found a bloody palm print at the scene of the crime.  The Scientific Investigation Unit compared the palm print to Andrews' print.  In a handwritten note, one of the prosecutors, Carmen Marino, wrote that "per SIU, partial print completely NOT DEFENDANT'S PRINT."  R.97-1 at 269.  He then scratched that note out and wrote "PRINT NOT CLEAR ENOUGH TO COMPARE."  *Id.*

Marino's notes do not show that the police suppressed exculpatory information from the prosecutor.  In an earlier postconviction action, Andrews said that he told his defense counsel "prior to trial and during trial that the prosecutor had in his files information of a 'bloody palm print' found at the scene of the crime which established that it was someone's print other than [Andrews']."  *Id.* at 245.  Given this prior acknowledgement, Andrews cannot now say that the prosecution never had the information in its files.

The notes do not help Andrews' cause in any event.  Marino knew the contents of his own notes.  Marino's handwritten note that the palm prints did not match, without more, therefore does not show that Marino never learned that the palm prints did not match.  In the absence of evidence that the police suppressed information from the prosecutor, Andrews' *Brady* claim necessarily fails.  *See Mack v. Bradshaw*, 88 F.4th 1147, 1155 (6th Cir. 2023).  In the absence of suppressed evidence, it follows that the City of Cleveland did not deploy an unconstitutional policy to create a *Brady* violation.

Andrews points to Marino's notes as proof that the police withheld a written report on the palm print.  But we can only speculate about whether a written report ever existed.  Marino attested that he got his information over the phone, not in a written report.  And while Andrews argues that the Scientific Investigation Unit should have written such a report, *Brady* concerns the failure to *turn over* evidence, not the failure to *create* it.  *See Hill v. Mitchell*, 842 F.3d 910, 926 (6th Cir. 2016) (explaining that *Brady* requires a showing that favorable evidence existed and was suppressed); *Bell v. Bell*, 512 F.3d 223, 234 (6th Cir. 2008) (stating that "not disclosing something" that police "d[o] not have[] cannot be considered a *Brady* violation" (quotations omitted)).  So long as police turn over the substance of an investigation to the prosecution, a *Brady* violation does not arise merely from failing to memorialize that information in a formal report.

*Police Report*.    On the same day that the police discovered Regina's body, Rowell prepared a four-page police report.  On page three, he documented that, "[a]t the scene," he and Hubbard found a bloody pillowcase from the Howard Johnson's Motor Lodge.  R.109-1 at 23. The same page added that he learned from the Howard Johnson's desk clerk that, on the same day as the murder, the bed linens from Watts's motel room were missing.  This page was favorable to Andrews and material to his defense because it showed someone else may have committed the murder.  *See Jackson*, 925 F.3d at 814.  Yet the parties dispute whether, as a factual matter, the police turned over this page to the prosecutors.

Whether the police turned over page three of the police report is a material dispute of fact that a jury must decide.  Two members of the prosecution team, Ronald Adrine and Joseph Gibson, attested that they were not aware of any physical evidence tying Watts to the murder. And sometime before 2018, the Cuyahoga County Prosecutor's Office digitally scanned its files spanning from the 1975 pre-trial investigation to the 1995 denial of state postconviction relief to Andrews' 2009 parole proceedings.  No legible copy of page three of the police report appears in any of these files.  Nor is there any other mention of the tie between the Howard Johnson's motel pillowcase and Watts.  A reasonable jury could conclude that police withheld the pillowcase evidence against Watts.

The City pushes back, pointing out that a copy of page three appears in the 2018 scan of the prosecution's files.  True enough.  But the page is incomprehensible, whether due to lack of ink, water damage, poor scan quality, or something else.  More, this illegible copy of the police report appears in the prosecutor's files sandwiched between a 1976 state court decision denying Andrews' direct appeal and a 1978 motion concerning post-conviction relief.  A reasonable juror, viewing this evidence, could conclude that police gave the prosecutors an illegible copy of page three or turned it over sometime after the trial ended.

The City also cites another copy of the report found elsewhere in the prosecutor's digital scan.  This one is legible, and it contains handwritten notes that resemble Marino's handwriting, supporting the inference that trial counsel had it.  But this annotated copy of the report skips from page two to page four.  A reasonable jury, again, could conclude that, when police turned over the report to the prosecutors, they left out page three.

The City maintains that the County Coroner's office had its own copy of this report.  But this copy, too, does little.  The police have a *Brady* obligation to provide information *to the prosecutors*, not just to the coroner, and there is no evidence that the coroner's files ever made it into the hands of the prosecutors.  *See Moldowan*, 578 F.3d at 378.

The City insists that the prosecutors could have pieced together some of the story from other evidence in the record.  They noted, for example, that the record contained evidence that police found a bloody pillowcase near the scene of the crime, that police suspected and arrested Watts, and that he stayed at the Howard Johnson's.  We agree to a point.  One page of the record, annotated with Marino's handwriting, discloses that police arrested Watts.  But those facts do not tell the full story.  The information on page three—that the pillowcase came from the Howard Johnson's Motor Lodge at the same time that all of Watts's bed linens went missing—provided the crucial link between the crime scene and the alternative suspect.  The City has not shown that this link appeared anywhere else in prosecution's files at trial.

A reasonable jury, to be sure, could still take the opposite view on whether the police withheld evidence.  A jury might discredit the prosecutors' testimony that they were unaware of physical evidence tying Watts to the murder.  It likewise might find that police gave one or more legible copies of page three to the prosecutors, and any such copies merely got lost or damaged in the years before the prosecutors digitized their files.  But those are quintessential factual questions for a jury to decide.

That leaves the question whether a City policy created the violation.  Because a reasonable jury could conclude that the police withheld information from the prosecution in violation of *Brady*, we must consider whether an unconstitutional policy of the City of Cleveland caused the violation.  *Jackson*, 925 F.3d at 828.  The parties briefed that issue at length below and renew their arguments here.  But the district court did not reach the issue, and ours is a court of "sequels, not premiers."  *Harrison v. Montgomery County*, 997 F.3d 643, 652 (6th Cir. 2021).  We will entrust the issue to the district court's good judgment in the first instance.  *See id.*

For these reasons, we reverse the district court's grant of summary judgment to the City of Cleveland and remand for the district court to consider whether a City policy caused the *Brady*

violation. We otherwise affirm the district court's dismissal of Andrews' claims against Hubbard and Rowell.

---

## CONCURRENCE / DISSENT

---

CLAY, Circuit Judge, concurring in part and dissenting in part. Isaiah Andrews spent over 45 years behind bars for the brutal murder of his wife. A later jury—untainted by the *Brady* violations of his first prosecution—found him not guilty, and the state of Ohio has formally exonerated him. I agree in part with today's holding because it allows Andrews' claim against the City of Cleveland to go forward. But because Andrews should also be able to seek relief from the estates of the individual officers who may have violated his constitutional rights, I respectfully dissent from Part II of the majority opinion.

Title 42 U.S.C. § 1983 safeguards individuals' constitutional rights and, when those rights are abridged by state action, provides those individuals with some form of relief. When adjudicating § 1983 claims, courts sometimes must borrow from the law of the state where the dispute arises. *See, e.g.*, *Browning v. Pendleton*, 869 F.2d 989, 992 (6th Cir. 1989) (applying Ohio's two year statute of limitations for bodily injury claims to a § 1983 civil rights action). Courts may only do so, however, where federal law is "deficient . . . to furnish suitable remedies and punish offenses against law" and where application of state law "is not inconsistent with the Constitution and laws of the United States[.]" 42 U.S.C. § 1988. In making this determination, "courts must look not only at particular federal statutes and constitutional provisions, but also at the policies expressed in them." *Robertson v. Wegmann*, 436 U.S. 584, 590 (1978) (citing *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 240 (1969)). "Of particular importance is whether application of state law 'would be inconsistent with the federal policy underlying the cause of action under consideration.'" *Id.* (quoting *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 465 (1975)).

The majority affirms the district court's dismissal of Andrews' claims against the Defendant Estates—the estates of the individual Defendants who have passed away in the decades since Andrews was incarcerated—because it claims that Ohio law bars Andrews' suit. Ohio requires that "all claims shall be presented within six months after the death of the decedent," and that "a claim that is not presented within six months after the death of the

decedent shall be forever barred as to all parties [and] [n]o payment shall be made on the claim and no action shall be maintained on the claim." Ohio Rev. Code § 2117.06(B)–(C). The majority holds that this provision of state law forecloses Andrews' claims against Defendant Estates because Andrews brought his claim outside of the two-month window prescribed by the statute (while otherwise complying with the relevant statute of limitations for § 1983 claims). This represents a dramatic reduction in the amount of time plaintiffs typically have to understand a violation has occurred, seek counsel, and file the necessary legal documents. If permitted to stand, today's holding will surely hinder a plaintiff's ability to vindicate his constitutional rights, in direct contravention of federal law.

In fact, both Supreme Court precedent and federal statutes command a different result. When deciding the application of state law to § 1983 claims, *Sullivan* instructs courts to apply whichever source of law "better serves the policies expressed in the federal statutes." 396 U.S. at 240. It is difficult if not impossible to see how the Ohio estate law better serves the policies behind § 1983—to vindicate constitutional or civil rights claims—when, in Andrews' case, it is being applied to foreclose such a claim. And § 1988 requires that federal law be "deficient" in "furnish[ing] suitable remedies" in order for state law to apply. 42 U.S.C. § 1988. But there is no indication that federal law in this case is so deficient that the Ohio estate law should apply. To the contrary, the Ohio estate law would prevent any suitable remedies that federal law otherwise provides—that which would come from the successful pursuit of a § 1983 claim.

The majority rests its contrary conclusion primarily on *Robertson*, in which the Supreme Court held that a Louisiana survivorship statute, which permitted only a plaintiff's spouse, children, parents, or siblings to maintain an action after the plaintiff's death, barred the action in that case. 436 U.S. at 587. Because "the greater state power upheld in *Robertson*"—to categorically bar an estate's ability to pursue an otherwise timely § 1983 claim—includes "the lesser power to require the timely presentation of claims before proceeding against an estate administrator," the Ohio law can bar Andrews' claim. Maj. Op. at 5. Admittedly, *Robertson* found that the Louisiana statute could apply because it did not conflict with federal law. 436 U.S. at 590–92. But *Robertson*'s holding was expressly a "a narrow one, limited to situations in which no claim is made that state law generally is inhospitable to survival of § 1983 actions[.]"

*Id.* at 594.  Thus rather than extend *Robertson* to cases that arguably will affect more § 1983 actions than the facts of that case, the actual holding of *Robertson* should have been left undisturbed.

There is good reason not to apply *Robertson* to this case.  First, the Court in *Robertson* believed it was addressing a Louisiana statute that would apply in relatively few cases, relying on the assumptions that "most Louisiana actions survive the plaintiff's death" and "surely few persons are not survived by one of these [the statutorily-specified] close relatives."  *Id.* at 591– 92.  While those statements may be true, the same cannot be said for § 1983 actions like Andrews'.  In wrongful conviction cases that later give rise to § 1983 suits, the plaintiffs may be incarcerated for decades—Andrews himself was incarcerated for nearly 46 years—making it highly likely that the relevant defendants may have died by the time the constitutional claim accrues.  *See Milestone: Exonerated Defendants Spent 20,000 Years in Prison*, Nat'l Registry of Exonerations, (Aug. 30, 2018), https://www.law.umich.edu/ special/exoneration/Documents/NRE.20000.Years.Report.pdf (collecting cases of exonerees who spent more than 30 years in prison before being ruled innocent).  In other words, *Robertson* depended on the assumption that it was applying a rule that would operate in a rare number of cases.  But the extension of that rule here has few guardrails to prevent it from extinguishing most if not all § 1983 actions that arise from long ago wrongful convictions in Ohio.

Second, the state law in *Robertson* constrained who could bring an action on behalf of a deceased *plaintiff*, not who could be sued in lieu of a deceased defendant.  That distinction matters.  The *Robertson* Court thought that the Louisiana law did not endanger the policy behind § 1983 because plaintiffs' estates—particularly those whose executors are unrelated to the harmed plaintiff—did not have a categorical right to recovery.  *Id.* at 592 ("The goal of compensating those injured by a deprivation of rights provides no basis for requiring compensation of one who is merely suing as the executor of the deceased's estate.").  But the goals of compensating those injured by a deprivation of rights surely provides a basis for requiring compensation *from* the estates of those who allegedly committed the constitutional violation.

Finally, it is worth noting that *Robertson* itself was likely wrongly decided, given Supreme Court precedent, as well as federal statutes like 42 U.S.C. § 1988, that encourages enforcement of § 1983 rather than allowing state law to poke holes in it. *See, e.g.*, *Sullivan*, 396 U.S. at 240; *Felder v. Casey*, 487 U.S. 131, 151 (1988). But given the substantial differences between this case and *Robertson*, this Court need not, and cannot, confront that question today. We could, and should, have found that the sufficient factual distinctions between this case and *Robertson*, not to mention the statutory and Supreme Court authority that precedes *Robertson* and has not been overruled, were sufficient to make *Robertson* inapplicable to this case—so that Andrews' claims could survive against all who caused him harm.

The majority's other arguments are unavailing. First the majority claims that "Ohio law does not cut off the ability of claimants in Andrews's shoes to bring a § 1983 suit" because it permits individuals like Andrews to bring their claims within two months of the claim's accrual. Maj. Op. 5. But this is still a drastic reduction in the amount of time civil rights claimants are typically permitted to bring their claims. As the Supreme Court has previously held, "[c]ivil rights victims often do not appreciate the constitutional nature of their injuries, and thus will fail to file a notice of injury or claim within the requisite time period[.]" *Felder*, 487 U.S. at 152. In that case, the Court held that a Wisconsin notice-of-claim statute that applied when plaintiffs sued government defendants was inapplicable as it conflicted with the strong federal interest in remedying constitutional violations. And the Court also noted that a time period of "a mere four months" was insufficient to properly safeguard the vindication of civil rights claims. *Id.* Surely a period that is half that—the two months that the Ohio estate statute imposes on plaintiffs like Andrews—is doubly alarming, and at odds with the objectives and policy goals behind § 1983.

But the majority argues that any reliance on *Felder* was misplaced. Maj. Op. at 7–8. In the majority's view, that the state law at issue in this case applies to *any* claim against an estate, whether it is brought under § 1983 or a different cause of action, distinguishes it from the state law in *Felder*, which imposed heightened restrictions only on claims against government entities (which includes most if not all § 1983 suits). In other words, because the Ohio estate law applies to claims other than those asserting violations of civil rights, the fact that it may foreclose civil

rights claims is of no moment.  By the majority's misguided logic, a state can impose any barrier to recovery for § 1983 claims so long as it imposes such a barrier on *all* claims.

But Supreme Court precedent does not allow this; it requires the application of federal law where it "better serves the policies expressed in the federal statutes."  *Sullivan*, 396 U.S. at 240.  And the federal statutes in this case were enacted to remedy "the deprivation of any rights, privileges, or immunities secured by the Constitution," 42 U.S.C. § 1983, and "for the protection of all persons in the United States in their civil rights, and for their vindication."  42 U.S.C. § 1988.  Thus, both Supreme Court precedent and the text of the relevant federal statutes emphasize the importance of vindicating civil rights over the application of state law.  A society that values its courts' ability to remedy civil rights violations would not tolerate the majority's endorsement of a regime where state law routinely prevents such a goal.

Finally, the majority favorably notes the interest that states have in the orderly disposition of estates.[1]  While states do have an interest in the efficient settlement of its citizens' estates, this interest is outweighed by the federal government's strong interest in the vindication of its citizens' civil rights.  *See Mitchum v. Foster*, 407 U.S. 225, 239 (1972) ("Section 1983 opened the federal courts to private citizens, offering a uniquely federal remedy against incursions under the claimed authority of state law upon rights secured by the Constitution and laws of the Nation."); *Burnett v. Grattan*, 468 U.S. 42, 55 (1984) (noting that a six month limitations period is "manifestly inconsistent with the central objective of the Reconstruction–Era civil rights statutes, which is to ensure that individuals whose federal constitutional or statutory rights are abridged may recover damages or secure injunctive relief"); *Wilson v. Garcia*, 471 U.S. 261, 277

---

[1]Andrews also argues that his claims fit within an exception to the Ohio estate statute because his suit does not seek recovery from the assets of the estates since the City of Cleveland will indemnify the estates.  The majority notes that *Ayers v. Cleveland*, 156 N.E.3d 848, 292–93 (Ohio 2020) restricts a third-party creditor from proceeding directly against an indemnitor, and observes that it is unsettled whether the Ohio law that requires localities to indemnify their employees necessarily means localities must also indemnify those employees' estates.  Maj Op. at 6–7.  I do not understand the majority to reach a categorical holding as to whether and when municipalities might be obligated to indemnify their employees' estates, particularly when other courts when confronted with similar issues have not found as much.  *See Graham v. Sauk Prairie Police Comm'n*, 915 F.2d 1085, 1089 (7th Cir. 1990) (holding that a state indemnity statute required the locality to indemnify the officer's estate).  Rather, the majority merely notes that this is one of several murky areas of law—all of which must and have yet to be resolved in Andrews' favor—before he can qualify for this exception of the Ohio estate statute.  Because I would not apply the Ohio estate statute at all, I would have left these questions untouched and for Ohio courts to decide.

(1985) ("By providing a remedy for the violation of constitutional rights, Congress hoped to restore peace and justice to the region through the subtle power of civil enforcement."); *Robertson*, 436 U.S. at 601 (1978) (Blackmun, J., dissenting) ("We are not concerned with the reasonableness of the Louisiana survivorship statute in allocating tort recoveries. We are concerned with its application in the face of a claim of civil rights guaranteed the decedent by federal law.").

A state probate rule preventing civil rights plaintiffs like Andrews, whose claim did not accrue until well after Defendants' deaths through no fault of his own but rather as a result of being wrongfully imprisoned by the state for 45 years, from holding those who violated the Constitution to task is undoubtedly inconsistent with federal law encouraging the enforcement and availability of § 1983 claims. This is particularly true for plaintiffs like Andrews who already face intense challenges when attempting to re-enter society after a lengthy wrongful incarceration. To require those individuals—who must find housing and employment, access healthcare that was unavailable to them behind bars, obtain drivers' licenses and learn new technology—to also gather the necessary documentary support and legal advice necessary to hold the estates of alleged constitutional violators to account in just two months is especially at odds with our civil rights laws. Today's decision recklessly expands *Robertson*'s already misguided holding and has the potential to allow any state procedural rule to drastically foreclose claims from individuals whose constitutional rights have been violated by state actors. I therefore respectfully dissent from Part II of the majority opinion.

With respect to the majority's *Monell* holding, I agree that Andrews has shown a genuine dispute of material fact only as to the missing page from the police report detailing the exculpatory evidence regarding Willie Watts. And I agree that it is appropriate for the district court to resolve, in the first instance, whether an unconstitutional policy of the City of Cleveland caused the alleged violation. I note briefly that our Court has previously held that Cleveland's policy, challenged both in that case and before us today, prohibiting its police department from turning over evidence, "can be read as consistent with a policy of not disclosing exculpatory [evidence.]" *Jackson v. City of Cleveland*, 925 F.3d 793, 831, 834 (6th Cir. 2019). Therefore, in

that case, a genuine issue of material fact existed as to whether Cleveland had a policy of suppressing exculpatory evidence in violation of *Brady.  Id.*

Further, our decision today allows Andrews' *Monell* claim against Cleveland to go forward while foreclosing his claims against the individual Defendant Estates—meaning Andrews will be in the somewhat unique position of arguing at trial that a municipal policy or custom led to his constitutional violation, without being able to hold any individual liable. Cleveland claims that such arguments are foreclosed by case law, because *Monell* liability for a constitutional violation can lie only when a "specific individual municipal employee committed the underlying constitutional violation and identifying a municipal policy or custom which caused the violation."  Def. Br., ECF No. 34, 34–35.  But this argument is contradicted by our precedent.

Certainly, a finding that there has been a constitutional violation is required for *Monell* liability to lie.  *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).  But this Court has not interpreted this statement so strictly as to require *individual* liability for that constitutional violation—just the opposite.  "[I]t is proper to consider possible constitutional violations committed by a municipality *qua* municipality, even in the absence of a showing of a constitutional violation by any one individual officer."  *Grote v. Kenton Cnty., Kentucky*, 85 F.4th 397, 414 (6th Cir. 2023); *see also Epps v. Lauderdale Cnty.*, 45 F. App'x 332, 334 (6th Cir. 2002) (Cole, J., concurring) (endorsing "read[ing] *Heller* to prohibit municipal liability only when the victim suffers no constitutional injury at all, not when the victim fails to trace that constitutional injury to an individual police officer"); *Winkler v. Madison Cnty.*, 893 F.3d 877, 900 (6th Cir. 2018) (recognizing *Heller*'s narrow scope).  Thus we, along with some of our sister circuits, have recognized that "*Heller* does not preclude a finding of municipal liability even if no individual officer violated the Constitution where constitutional harm has nonetheless been inflicted upon the victim and the municipality is responsible for that harm."  *Grote*, 85 F.4th at 414 (citation omitted); *see also Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002) ("If a plaintiff establishes he suffered a constitutional injury *by the City*, the fact that individual officers are exonerated is immaterial to [municipal] liability under § 1983."); *Speer v. City of Wynne*, 276 F.3d 980, 986 (8th Cir. 2002) ("The appropriate question under *Heller* is whether a verdict or

decision exonerating the individual governmental actors can be harmonized with a concomitant verdict or decision imposing liability on the municipal entity. The outcome of the inquiry depends on the nature of the constitutional violation alleged, the theory of municipal liability asserted by the plaintiff, and the defenses set forth by the individual actors."); *Fagan v. City of Vineland*, 22 F.3d 1283, 1294 (3d Cir. 1994) (holding that "a municipality can be liable under section 1983 and the Fourteenth Amendment for a failure to train its police officers" even if no individual officer violated the Constitution).

Thus, on remand and while evaluating Andrews' *Monell* claim, the district court may be confronted with the seemingly difficult question of whether his claim against Cleveland can proceed at all without any anchor of individual liability.  But this question has an easy answer. Plaintiffs seeking to hold municipalities to account will still need to allege, establish, and prove that an official policy or custom *caused* a violation of their constitutional rights.  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978).  It is entirely possible for plaintiffs to do so without necessarily proving that a specific individual violated their rights.  Such a scenario might arise when "when the constitutional harm complained of relates to lack of action due to a failure to train," *Grote*, 85 F.4th at 414, when a constitutional violation is "attributable to a municipality's acts alone and not to those of its employees—as when a government actor in good faith follows a faulty municipal policy," *Epps*, 45 F. App'x at 334 (Cole, J., concurring), or when "the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights." *Id.* (quotation omitted).  Therefore, a finding that an individual officer is liable for the constitutional violation is not a necessary prerequisite of *Monell* liability—just a finding that a constitutional violation occurred.  And Andrews has certainly met his burden on that issue.